Robert R. BUSH

v.

DIAMOND OFFSHORE COMPANY.

No. CIV.A. 97–3176.

United States District Court,
E.D. Louisiana.

April 7, 1999.

Allan Berger, Allan Berger & Associates, PLC, New Orleans, LA, Charles Bruce Colvin, House, Kingsmill, Riess & Seabolt, LLC, New Orleans, LA, David Paul Gontar, George Warren Byrne, Jr., Randy Jay Ungar, Randy J. Ungar & Associates, Inc., New Orleans, LA, for plaintiff.

Nelson W. Wager, III, Chopin, Wager, Cole, Richard, Reboul & Kutcher, LLP, Metairie, LA, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FALLON, District Judge.

## I.  PROCEDURAL HISTORY

Robert R. Bush was employed by Diamond Offshore Management Company ("Diamond") as a roustabout performing work aboard Diamond's semi-submersible drilling rig, the "Modu Ocean Star." On June 17, 1997, Bush was assisting in off loading pallet sized material from a service vessel, the M/V PAULA K. Bush and a co-employee were using tag lines to stabilize the loads as they were being lifted from the M/V PAULA K to the "Modu Ocean Star." As a load was lifted the end of a tag line held by Bush was pulled across the M/V PAULA K's deck and his leg became entangled in the line. Bush was raised off the deck of the M/V PAULA K. The load and Bush swung to the after-port side of the vessel and Bush struck the bulwark. His boot came off and he fell to the deck of the vessel. He sustained injuries as a result of this incident. Bush sued Diamond alleging that the incident and resulting damages were caused by Diamond's negligence and/or the unseaworthiness of its vessel. In addition, Bush sued Diamond claiming maintenance and cure and damages for willfully and wantonly failing to timely provide maintenance and cure.

Diamond denies it was negligent or that its vessel was unseaworthy. Instead, Diamond claims that Bush's injuries resulted in whole or part from Bush's negligence. Furthermore, Diamond claims that Bush intentionally and fraudulently did not disclose prior disabling conditions and has, therefore, forfeited his right to maintenance and cure.

The case came on for trial before the Court without a jury. The trial commenced on January 13, 1999 and concluded on January 15, 1999 with the understanding that the record would be kept open in order to take the testimony of Dr. Stuart Phillips who was out of the country at the time of the trial. Dr. Phillips's testimony was taken on March 22, 1999.

The matter is now ready for a decision. The Court having carefully considered the testimony of all the witnesses, the exhibits entered at trial, the record, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby enters the following findings of fact and conclusion of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes, in whole or in part, a finding of act, the Court adopts it as such.

## II.  FINDINGS OF FACT

**1.**

The "Modu Ocean Star" is a semi-submersible drilling vessel used to transport men and material over navigable water. It is owned, operated and controlled by Diamond.

**2.**

On and prior to June 17, 1997, the "Modu Ocean Star" was being used to prospect for and produce minerals beneath the sea bed of the Gulf of Mexico off the coast of Louisiana and other states.

**3.**

Robert R. Bush was employed by Diamond as a roustabout aboard the rig. His work contributed to the mission and express purpose of the "Modu Ocean Star."

**4.**

The incident occurred at about 3:00 a.m. on June 17, 1997 while Bush and a co-employee, Walter Guidry, unloaded a series of pallet boards of chemical products from the work boat M/V PAULA K to the "Modu Ocean Star". The work boat was not anchored or secured to the rig. It floated unsecured and was held in position by its engines. The seas were at least six feet with winds at 15 miles per hour. A crane located on the "Modu Ocean Star" was being used to lift the pallets. The "Modu Ocean Star's" crane was about 100 feet above the deck of the M/V PAULA K.

**5.**

Bush and Guidry were positioned on the work boat and would secure the lift lines or slings to the pallets. Guidry was the designated signal man and would signal the crane operator when it was appropriate to lift the board. The men would each hold on to a tag line as the load was lifted in an effort to guide the board off the work boat so it could be placed on the "Modu Ocean Star."

**6.**

Because of the weather conditions, long tag lines were used.

**7.**

Following this procedure several pallets were successfully lifted off of the work boat and moved onto the deck of the movable drill barge. On the occasion in question, crane operator Johnny Howard lowered the lift lines to Bush and Guidry who hooked them onto a pallet. The pallet was lifted but it was not properly balanced and had to be lowered so the lift line could be adjusted. After this was done, the load was lifted again. This time, as the load was being raised, the bitter end of the tag line swung "unreasonably fast" across the deck of the work boat. The tag line wrapped around Bush's leg. He hopped along the deck as the load was ascending in an unsuccessful attempt to free himself from the line. The pallet continued its assent. Bush was upended and raised off the deck.

**8.**

At that time, signal man Guidry held up his right arm, clinched his fist and moved it from side to side, intending to signal the crane operator to immediately stop the assent. This signal was not the "emergency stop" signal designated in the defendant's safety manual. The crane operator saw Bush hopping toward the ascending load, but then lost sight of him. He stopped the assent of the load about the same time that Guidry gave the signal.

**9.**

The load swung and Bush swung with it hitting the port bulwark of the work boat. When his boot came off, he fell and landed head first on the deck of the vessel.

**10.**

As a result of the above-described incident, Robert R. Bush was injured. He complained of pain in the head, neck, ribs and lower back. He was treated in the medical room aboard the rig and the next day transferred to West Jefferson Hospital where he received treatment in the emergency room. Several days later he was seen by Dr. Christopher E. Cenac who continued to treat Bush until August 4, 1997. Dr. Cenac's treatment consisted of conservative care and various diagnostic tests, including MRI scans of the lumbar and cervical areas.

**11.**

Bush was subsequently treated by Dr. George A. Murphy who examined him on September 4, October 20, November 10, and December 18 of 1997. Dr. Murphy saw Bush again on March 3, 1998. Based on his examination and review of the diagnostic tests, Dr. Murphy concluded that Bush had disc pathology at C5–6 and C6–7.

**12.**

Bush was also examined by and received some treatment from Dr. Vernon Van Bolden. Bush saw Dr. Van Bolden periodical-

ly from November 12, 1997 through May of 1998. Dr. Van Bolden concluded that Bush sustained a lumbar strain and cervical radiculopathy with his MRI revealing disc pathology at C5–6 and C6–7.

13.

Bush was examined by Dr. Edmund Landry on July 10, 1998 and again on November 9, 1998. Dr. Landry testified that the MRI and the EMG diagnostic studies were consistent with cervical disc pathology, but he found some inconsistency between his clinical findings and the diagnostic studies.

14.

In his examination, Dr. Landry found that Bush's complaints of pain and weakness were on the left side whereas the MRI studies showed defects or narrowing on the right. Dr. Landry has no explanation for this discrepancy. After further reflection Dr. Landry testified that Bush's complaints are probably caused by cervical neuropathy not associated with an injury to a cervical disc. This neuropathy, according to Dr. Landry, could have been caused by the 1997 incident.

15.

Robert Bush was also examined by Dr. Stuart I. Phillips on April 13, May 26 and August 24, 1998. Dr. Phillips examined the EMG dated November 11, 1998 and the MRIs dated July 1, 1997 and December 15, 1998.

16.

Bush was also examined by Dr. J. Carlos Pisarello on April 27, 1998. His clinical examination was negative for any nerve root or disc pathology. Dr. Pisarello testified that although the reports of the EMG and MRI indicated nerve root and disc abnormality he disagreed with these findings. Apparently Dr. Pisarello does not place much value on EMG's or MRI's in diagnosing these types of injuries or, at best, questioned the accuracy of the radiologist who actually performed the tests.

17.

Prior to the incident aboard the "Modu Ocean Star" in 1997 Bush was involved in several automobile accidents and received soft tissue injuries. He was symptom free, however, at the time he applied for work with the defendant.

18.

In addition to his physical complaints Bush claims the incident caused or aggravated mental or psychological injuries. In connection with these complaints Bush was examined and/or treated by Dr. David H. Mielke, a psychiatrist selected by the plaintiff, and Dr. Richard R. Roniger, a psychiatrist selected by the defendant. Both doctors agree that Bush has some psychological pathology, but the evidence indicates that he has a history of psychological or psychiatric difficulties which long predates his employment with the defendant. In fact, in 1974, while in the United States Air Force, Bush was diagnosed as having a behavior disorder identified as an "unstable personality." He was recommended for discharge for unsuitability. While in the Air Force Bush received treatment for his mental condition.

19.

Bush seeks to recover damages resulting from his injuries. He also claims that Diamond wantonly and willfully denied him maintenance and cure. Diamond asserts that Bush's injuries and/or disabilities predated his employment with Diamond. Furthermore, Diamond asserts that Bush intentionally and with malice failed to disclose all of his past injuries and/or disabilities and thus forfeited any right to maintenance and cure.

20.

Robert Bush's date of birth is July 12, 1951. On June 17, 1997, the date of the incident giving rise to the present lawsuit, Bush was 46 years old. He was employed by Diamond as a roustabout and had worked for Diamond in that capacity for about one month. His employment history prior to his injury reflects a wage earning

capacity of approximately $10,000 per year.

### 21.

As a result of his injury, Bush claims he cannot return to his employment with Diamond. He did however return to gainful employment in January of 1998 and now works part time as a substitute teacher in the public schools in Orleans Parish. He has a Bachelor of Arts and Masters degree in Arts and Science, and was previously employed as a high school coach and teacher.

### III. CONCLUSIONS OF LAW

### 1.

At the time of Robert R. Bush's injury he was a seaman or member of the crew of the M/V PAULA K, which was at all pertinent times a vessel in navigation. *See McDermott International v. Wilander,* 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991); *Chandris, Inc. v. Latsis,* 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995); *Harbor Tug and Barge v. Papai,* 520 U.S. 548, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997); *Offshore v. Robison,* 266 F.2d 769 (5th Cir.1959).

### 2.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333 which provides original jurisdiction over admiralty and maritime matters, and 46 U.S.C.App. § 688, the Jones Act, which provides jurisdiction over a claim by a seaman against his employer to recover damages for personal injuries sustained in the course and scope of employment.

### 3.

The substantive law applicable to this case is the Jones Act and the general maritime law.

### 4.

█ Under the Jones Act, employers of seamen have a duty to provide their employees with a reasonably safe place to work. *See 1 Schoenbaum, Admiralty and Maritime Law,* 319 (2d Ed.1994). Also, under the law applicable to the case, the seaman's employer is legally responsible for the negligence of one of its employees while that employee is acting in the course and scope of his job. *See Gilmore & Black, The Law of Admiralty,* 277 (2d Ed.1975). The Jones Act as it is interpreted by the Court also addresses the responsibilities of the seaman. Under the Jones Act a seaman is obligated to act with ordinary prudence under the circumstances. In other words, a seaman has the duty to exercise that degree of care for his or her own safety that a reasonable seaman would exercise under the same or similar circumstances. *See Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir.1997).

### 5.

█ A vessel owner also has a duty to the members of the crew to supply a seaworthy vessel. This duty extends to the hull of the vessel, the vessel's cargo handling machinery, lines and tackle and all kinds of equipment either belonging to the vessel owner or brought aboard by others. *See 1 Schoenbaum, Admiralty and Maritime Law,* 333 (2d Ed.1994).

### 6.

█ In the present case, it is the conclusion of this Court after hearing all of the testimony, observing the demeanor of the witnesses, reviewing the exhibits, and the record, that Robert R. Bush's injuries were proximately caused by the negligence and/or fault of the defendant, Diamond. The credible evidence supports the conclusion that the incident on June 17, 1997 was due to either or all of the following: improper working practices of employees other than the plaintiff; failure on the part of the lookout and/or crane operator to take timely action to avoid the incident; failure to give proper and timely signals; allowing the signalman to be positioned in a location in which the ascending load blocked the view of the crane operator making communication between them inef-

fective or impossible, use of inadequate or inappropriate equipment and/or working under marginal or unsafe weather conditions.

7.

The incident of June 17, 1997 proximately caused Robert Bush to sustain physical injuries. All of the orthopedists agree that Bush sustained strain or sprain injuries to the neck and lower back as well as blunt injuries to the ribs. Moreover, all of the doctors except Dr. J. Carlos Pisarello agree that the EMG and the MRI studies reveal disc and/or nerve pathology. The doctors disagree, however, on the diagnosis and extent of Robert Bush's injury.

8.

Doctors Cenac, Van Bolden and Phillips found the test results and their clinical evaluations were consistent with disc injuries. Doctors Pisarello and Landry see some inconsistency stressing that in their examinations Bush complained of problems with his left sided extremities when the MRI findings suggested defects on the right. Dr. Phillips agrees that there is a defect on the right which he attributes to a bone spur. Nevertheless, he opines that the tests and his evaluation reveal disc pathology in the cervical region. In short, Dr. Phillips testified that Bush has both a bone spur and an injury to cervical discs.

9.

Injuries to the intervertebral discs, nerves and soft tissues of the cervical and lumbar are notorious for producing waxing and waning symptoms. In this case, for instance, the record reflects that on different occasions Bush complained of pain in the left extremity, in the right extremity and in both right and left extremities. His complaints differed depending on his physical condition at the time of the examination and the nature and extent of the examination. Thus, there were times when his physical complaints were consistent with the objective test results. The weight of the credible evidence supports the conclusion that the 1997 incident aboard the "Modu Ocean Star" proximately caused injuries to the discs and nerve roots of Bush's cervical spine at levels C5–6 and C6–7. He is now in pain and will require future treatment, including a laminectomy and fusion.

10.

In addition to his physical injuries, Bush claims he sustained psychological or mental injuries. There is evidence that Bush has psychological or mental disorders. Nevertheless, Bush has a long history of psychological or psychiatric pathology predating his employment with Diamond. The credible evidence supports the conclusion that any mental or psychiatric difficulty predated the 1997 incident and is not related to the injury and has not been aggravated by it.

11.

Finally, Bush seeks maintenance and cure and damages for failure to pay maintenance and cure. Maintenance and cure is a contractual form of compensation provided to seamen by the general maritime law. Seamen are entitled to maintenance and cure when they fall ill or become injured or disabled in the service of the ship. The ship owner's obligation is deeply rooted in maritime law and is an incident to or implied in the contract of employment between the ship owner and the seaman. *See McCorpen v. Central Gulf Steamship Corp.*, 396 F.2d 547 (5th Cir.1968). The right to maintenance and cure goes at least as far back as the laws of Oleron, which first codified this principle some say in 1200 A.D. There is some indication that maintenance and cure even predated that and actually was recognized in the maritime law with the Phoenicians in the 9th Century B.C. Be that as it may, the point is a seaman's right to maintenance and cure has long been recognized and this remedy is accepted by most maritime nations and certainly by the United States.

**12.**

■ Maintenance and cure is designed to provide a seaman with food and lodging when he or she becomes sick, injured or disabled in the ship's service. It extends during the period when the seaman is incapacitated from doing work and continues until the seaman reaches maximum medical recovery. *See Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

**13.**   '

■ Maintenance is a per diem living allowance paid as long as a seaman is outside of the hospital and has not reached the point of "maximum cure,"· as that term has been defined by case law. Cure, on the other hand, involves the payment of therapeutic medical and hospital expenses until the point of maximum cure. *See Pelotto v. L & N Towing Co.*, 604 F.2d 396 (5th Cir.1979). If an employer willfully and wantonly fails to pay maintenance and cure to a seaman employee, the seaman may recover past maintenance plus attorney's fees but not punitive damages. *See Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496 (5th Cir.1995).

**14.**

■ A seaman's right to maintenance and cure is subject to very few well-defined and very narrow exceptions. A seaman who intentionally misrepresents or conceals medical facts from an employer while applying for work will forfeit his right to seek maintenance and cure if the misrepresented or nondisclosed facts are material to the employer's decision to hire him and if there is a causal connection between the withheld information and the injury which is eventually sustained. *See McCorpen v. Central Gulf Steamship Corp.*, 396 F.2d 547 (5th Cir.1968).

**15.**

■ To defeat the seaman's right to maintenance and cure based upon intentional concealment of a material fact, however, the employer must prove the following:

1. That the seaman intentionally misrepresented or concealed facts;

2. That the nondisclosed facts were material to the employer's decision to hire the seaman; and

3. That a causal connection existed between the withheld information and the injury complained of in the instant suit. *See Caulfield v. Kathryn Rae Towing*, 1989 A.M.C. 1769, 1989 WL 121586 (E.D.La.1989); *Ruiz v. Plimsoll Marine, Inc.*, 782 F.Supp. 315 (M.D.La.1992).

**16.**

■ The evidence falls short of proving that Bush intentionally misrepresented or concealed material facts. Furthermore, there is no evidence to establish that any prior incident caused or precipitated the cervical injury presently complained of by Bush. The evidence reflects that Bush recovered from the prior injuries and was pain free and able to perform heavy manual labor at the time of his injury on June 17, 1997. Thus he is entitled to maintenance and cure for this injury. Nevertheless, Diamond's actions in not making current maintenance and cure payments were not malicious, wanton or willful. Indeed, Diamond voluntarily paid maintenance and provided medical care until a dispute arose among the treating and/or examining physicians regarding Bush's medical status. At that point maintenance and cure were terminated. Diamond is not liable for damages, such as attorney's fees, for failing to pay current maintenance and cure. Furthermore, Diamond is not presently liable for any current maintenance payments since Bush has reached a static condition and is employed.

**17.**

It is now appropriate to consider Bush's damages. The evidence reflects that historically Bush earned about $10,000.00 per year. This figure will be used to deter-

mine his economic loss. The evidence also reflects that Bush has several college degrees and has worked since January 1, 1998 as a teacher in the Orleans Parish School System. Bush returned to part-time teaching on January 1, 1998 and earned about $2,000.00 from that date until the date of trial. For the period between the time of his injury and the date of his return to part-time work, Bush's loss of income amounts to $5,000.00. From the time he returned to work and the date of trial, Bush lost $8,000.00. Thus his total past earnings loss is $13,000.00.

18.

After a period of convalescence, Bush is expected to be able to return to his work as a teacher and gradually work up to the point at which he can pursue this career full time. The evidence supports the conclusion that his future economic loss will be $25,000.00.

19.

Bush needs future medical care, including surgery, which is expected to cost $20,-000.00. Bush is presently in pain. The credible evidence indicates that he will have some pain in the future. The pain is expected to improve after his surgery and in time become tolerable. His pain is expected to continue to some degree for the remainder of his life. The Court concludes that an appropriate amount for this element of damage is $130,000.00 ($50,000.00 of which is attributed to the time prior to trial, and $80,000.00 post trial). Finally, Bush is entitled to past medical expenses of $6,500.00.

20.

It is well settled that in an action at law under the Jones Act, the recovery of prejudgment interest is not permitted. *See Theriot v. J. Ray McDermott,* 742 F.2d 877 (5th Cir.1984). Nevertheless, the same rule does not apply to Jones Act cases brought under the court's admiralty jurisdiction, tried without a jury. Pursuant to the court's admiralty jurisdiction invoked under the Federal Rules of Civil Procedure 9(h), when a Jones Act case is brought under the court's admiralty jurisdiction, and the case is tried to the Court and not to a jury, an allowance of prejudgment interest is within the discretion of the trial court, even if there is not a finding of unseaworthiness. *See Williams v. Reading and Bates Drilling Co.,* 750 F.2d 487 (5th Cir.1985); *Doucet v. Wheless Drilling,* 467 F.2d 336 (5th Cir.1972). The Court finds that an award of prejudgment interest from date of judicial demand is appropriate in this case at the rate of 4.9% on the plaintiff's past damages as a described above. *See Martin v. Walk, Haydel & Assoc.,* 794 F.2d 209 at 212 (5th Cir.1986).

*IV. SUMMARY*

On the basis of the following findings of fact and conclusions of law, the Court finds that plaintiff, Robert R. Bush, has sustained damages in the following amounts:

| | |
|---|---|
| Past earnings loss | 13,000.00 |
| Future earnings loss | 25,000.00 |
| Past medical expenses | 6,500.00 |
| Future medical expenses | 20,000.00 |
| Pain and suffering, past, present and future | 130,000.00 |
| TOTAL LOSS | $194,500.00 |

The defendant Diamond is liable to the plaintiff for the total of these losses with prejudgment interest from the date of judicial demand for the amount representing the past losses and interest from the date of judgment for future losses.