**Curtis M. LOFTIN, Plaintiff,**

v.

**KIRBY INLAND MARINE, L.P., Defendant.**

**Civil Action No. 1:06–CV–739.**

United States District Court, E.D. Texas, Beaumont Division.

July 13, 2007.

Dennis L. Brown and Emmanuel Nick Cokins of Law Office of Dennis L. Brown, Houston, TX, for Plaintiff.

Dennis John Sullivan of Stepp & Sullivan, Houston, TX, for Defendant.

## MEMORANDUM AND ORDER

MARCIA CRONE, District Judge.

Pending before the court is Defendant Kirby Inland Marine, L.P.'s ("Kirby") Motion to Dismiss Claims of Punitive Damages for Failure to State Claim on Which Relief May be Granted (# 34). Plaintiff Curtis M. Loftin ("Loftin") alleges that on February 22, 2006, he was injured while performing his regular duties aboard the M/V El Paso, thereby injuring his back and other parts of his body. He claims that his injuries were caused by Kirby's Jones Act negligence and the unseaworthiness of the M/V El Paso, entitling him to maintenance and cure. Loftin contends that Kirby has failed in its duty to provide maintenance and cure. Further, he argues that Kirby's "failure to provide the benefits of maintenance and cure was not only unreasonable, but was arbitrary and capricious, or willful, callous and persistent, and that, as a result thereof, [Loftin] is entitled to an award of punitive damages and attorney's fees."

In response, Kirby maintains that punitive damages are not available to a plaintiff in an action for maintenance and cure and, therefore, seeks dismissal of Loftin's punitive damages claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that Kirby's motion has merit.

## I. Background

On February 22, 2006, Loftin was serving as a deckhand/tankerman trainee aboard the M/V El Paso, a vessel owned by Kirby. When his shift began around midnight, the M/V El Paso was moored alongside two barges. The previous shift, then relieved by Loftin and other crew members, had been preparing to connect the two barges with a crossover hose.[1] A crane attached to the M/V El Paso lifted the heavy crossover hose from the vessel and placed it on the deck of one of the barges. Two tankermen from the M/V El Paso then lifted the hose—one in front and the other in the middle of the hose. They then moved the hose a few feet before asking Loftin for assistance. Complying with his crew members' request, Loftin picked up the rear of the hose by the steel plate. Loftin alleges that, only moments later and without warning, the other two tankermen dropped the hose, causing Loftin to fall to the deck. Although Loftin initially indicated that he experienced some physical discomfort from his fall, he stated that he was "more embarrassed than anything" and continued to work until his shift ended at 6:00 a.m.

Following this shift, Loftin transferred to another vessel owned by Kirby, the M/V Roan, where he worked two shifts. Loftin claims that, during his first shift on the M/V Roan, the pain from his fall on the M/V El Paso began to intensify, impacting his job performance. The captain noticed

---

1. When two barges are tied off side by side, a crossover hose is stretched across both vessels so that they may be loaded or unloaded simultaneously. The crossover hose on the M/V El Paso was made of a rubber material and was approximately twenty to thirty feet long, eight to ten inches in diameter. Steel plates, approximately fourteen to fifteen inches in diameter and three-fourths of an inch thick, flanked both ends of the hose.

Loftin's difficulty with his assigned duties and confronted him. At that time, Loftin informed the captain of the events aboard the M/V *El Paso* and indicated that he was currently in pain. The captain responded by asking Loftin if he would like to file a formal report. Loftin declined, stating that he "wanted to keep working."

Taking into consideration Loftin's alleged condition, the captain assigned him to a less strenuous task during his second shift—painting the engine room. Loftin painted an area about the "size of a chair" before claiming to be overcome with pain. He then decided to file a formal report with the captain and requested to be taken ashore. The captain complied and immediately contacted Kirby. The vessel interrupted its operations at sea to rendezvous with a Kirby driver at a dock near Beaumont, Texas. The driver transported Loftin to the emergency room at San Jacinto Methodist Hospital in Baytown, Texas. Although the details of Loftin's emergency room visit are not currently before the court, the record reflects that Loftin spent several hours at the hospital and was ultimately administered an injection for his pain.

Concurrent with Loftin's emergency room visit, Kirby initiated steps to provide Loftin with additional care. Kirby arranged transportation from San Jacinto Methodist Hospital to Wilson Hall, a Kirby facility where Loftin was provided temporary accommodations. An appointment with U.S. Healthworks in Houston was also scheduled for the following morning, as well as round-trip transportation to that facility.

On February 24, 2006, two days after his alleged injury, Loftin arrived for the first of a series of appointments that continued through March 23, 2006. During this period, Loftin received physical therapy treatments, medication, and an MRI on March 6, 2006. U.S. Healthworks also referred him to an orthopedic surgeon, Dr. David Vanderweide ("Dr. Vanderweide"), for an examination. Dr. Vanderweide performed a physical examination on March 13, 2006, which involved a neurological evaluation [2] of Loftin's cervical spine. He also performed a Tinel's test, "another extension of the neurological evaluation in the peripheral skeleton." These tests are designed to reveal nerve damage. Dr. Vanderweide found nothing abnormal with regard to Loftin's test results. Additionally, he reviewed the MRI report, which indicated that the soft tissue strains to Loftin's neck and lower back were superimposed upon existing, significant degenerative changes in his back. The MRI report, according to Dr. Vanderweide, also revealed a bulging disc stemming from an undetermined cause. He concluded, however, that the degenerative changes were not likely to be caused by the incident aboard the M/V *El Paso*, as "these changes were long-standing in nature and require a long period of time to evolve." He recommended the continuation of physical therapy and concluded that Loftin did not need surgery.

Dr. Vanderweide subsequently referred Loftin to Dr. Michael Graham ("Dr. Graham"), an orthopedic surgeon who specializes in spinal conditions. Dr. Graham first saw Loftin as a consulting physician on March 30, 2006. At that time, Loftin's principal complaint was of lower back pain radiating into both legs. Dr. Graham inspected a copy of Loftin's MRI report and concluded that Loftin suffered from advanced degenerative disc disease, arthritis, and a bulging disc. He indicated that

---

**2.** As explained by Dr. Vanderweide, a neurological evaluation consists of three basic parts: (1) assessing the reflexes for muscle groups in a given area, (2) assessing reflex strength, and (3) assessing whether the reflex sensations are intact.

these conditions were not due to an acute injury, but that the problem had existed for "many, many years." Dr. Graham also performed a physical examination of Loftin, which yielded no "significant muscular paralysis or weakness of his legs" and revealed that Loftin's "reflexes were within normal limits." According to Dr. Graham, these results signify that Loftin's "nerves in his lower back were all working properly on the date that [he] examined him." Additional tests showed the absence of a pinched nerve. Thus, Dr. Graham determined that any type of invasive treatment would be premature. Further, he indicated that patients with this type of injury should generally undergo six months to one year of comprehensive conservative treatment consisting of weight loss, exercise, physical therapy, chiropractic treatment, and medications prior to any invasive treatment. Specifically, Dr. Graham prescribed Celebrex, a widely used anti-inflammatory medication, to be taken concurrently with the vicodin, zanaflex, and lodine already prescribed to Loftin.

On May 2, 2006, during a follow-up visit with Dr. Graham, Loftin indicated that his back pain had not improved. He also reported that he had neglected to commence the recommended physical therapy. Accordingly, Dr. Graham advised Loftin to see his primary care physician for a complete medical evaluation to make sure that he did not have any non-orthopedic problems contributing to his current symptoms. Dr. Graham also recommended that Loftin commence four weeks (three times a week) of physical therapy with the Spine & Rehabilitation Center. Loftin complied and met with Dr. Todd Custer ("Dr. Custer"),

a chiropractor, at the Spine & Rehabilitation Center on May 23, 2006. Dr. Custer provided Loftin physical therapy three times per week for four weeks and performed additional testing.

Loftin returned to Dr. Graham's office on June 13, 2006. At that time, Loftin informed Dr. Graham that his condition was improving. Dr. Graham then recommended that Loftin continue with physical therapy and scheduled a follow-up appointment in July 2006. Loftin never returned to Dr. Graham's care. Rather, he continued to meet with Dr. Custer, obtaining multiple chiropractic and physical therapy treatments. In all, Loftin had twenty-one visits with Dr. Custer, ending February 20, 2007. During these visits, Loftin underwent therapeutic exercises, an ultrasound on the lumbar spine, deep tissue massages, as well as ice and electric stimulation. Spinal manipulative therapy[3] was also utilized in the lumbar region.

Ultimately, due to Loftin's unresponsiveness to conservative treatment combined with his MRI results indicating a bulging disc, Dr. Custer referred Loftin to Dr. David Strausser ("Dr. Strausser"), another orthopedic surgeon. Dr. Strausser performed a physical examination of Loftin on August 28, 2006. His examination revealed that Loftin was suffering from back pain and a degenerative disc in the lumbar spine, but he saw no evidence of any nerve impingement. Dr. Strausser informed Loftin that, depending upon other test results, such as a lumbar discogram, having his vertebrae fused could be an option. Such a procedure would entail inserting "instrumentations" into the vertebrae to

---

**3.** The Spine & Rehabilitation Center's Patient Agreement explains that "[s]pinal manipulation consists of adjustments that seek to restore normal function to the spine and other joints. Typically, this involves applying a specific, highly-controlled treatment directly to a joint or muscle. This treatment often reduces or eliminates both local and referred pain, allows muscle spasms to relax, and may even release the irritation from the nervous system, which may result in other health benefits."

prevent them from moving, which could eliminate or reduce the pain. According to Dr. Strausser, surgery such as this would require an average of four to six months of postoperative care.

Loftin subsequently requested pre-authorization for additional treatment by Dr. Strausser in August 2006. Kirby denied pre-authorization, noting that "Loftin had not complied with the recommended treatment and advices of Dr. Michael Graham, and specifically that he had not returned to his primary care physician for further examination, in an attempt to determine if Loftin's symptoms were the result of a non-orthopedic problem." No further treatment has been provided to Loftin.

On November 20, 2006, Loftin filed suit against Kirby, seeking relief under the Jones Act and general maritime law for the injuries he allegedly sustained while employed as a seaman. He also requests punitive damages and attorney's fees, arguing that Kirby's denial and/or unreasonable delay of payment of maintenance and cure was "arbitrary and capricious, or willful, callous[,] and persistent." Kirby now moves for dismissal of Loftin's claim for punitive damages pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. *Analysis*

### A. *Dismissal for Failure to State a Claim under Rule 12(b)(6)*

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests only the formal sufficiency of the statement of a claim for relief and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001), *cert. denied*, 536 U.S. 960, 122 S.Ct. 2665, 153 L.Ed.2d 839 (2002). It

is not a procedure for resolving contests about the facts or the merits of a case. *See* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1356, at 294 (1990). In ruling on such a motion, the court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir.2004); *Ramming*, 281 F.3d at 161; *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000). Nevertheless, "the plaintiff's complaint [must] be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged." *Ramming*, 281 F.3d at 161 (citing *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir.1989)). Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Generally, the court may not look beyond the four corners of the plaintiff's pleadings. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 261 (5th Cir.1999); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996); *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir.1992).

" 'A motion to dismiss under rule 12(b)(6) "is viewed with disfavor and is rarely granted." ' " *Gregson v. Zurich Am. Ins. Co.*, 322 F.3d 883, 885 (5th Cir. 2003) (quoting *Collins*, 224 F.3d at 498 (quoting *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982))); *accord Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir.1997). " 'The question therefore is whether in the light most favorable to the plaintiff and with

746

every doubt resolved in his behalf, the complaint states any valid claim for relief.'" *Collins,* 224 F.3d at 498 (quoting 5A Charles A. Wright & Arthur R. Miller, *supra,* § 1357, at 332–36); *accord Lowrey,* 117 F.3d at 247. "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'" *Ramming,* 281 F.3d at 161–62 (quoting *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1137 (5th Cir.1992)). Hence, "when considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court must examine the complaint to determine whether the allegations provide relief on any possible theory." *Id.* (citing *Cinel v. Connick,* 15 F.3d 1338, 1341 (5th Cir.), *cert. denied,* 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994)).

## B. *Availability of Punitive Damages for Denial of Maintenance and Cure*

Prior to the mid–1990s, federal courts "awarded punitive damages [under general maritime law] to seamen where maintenance and cure benefits have been arbitrarily and willfully denied." *Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496, 1498 (5th Cir.1995), *cert. denied,* 516 U.S. 1046, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996) (citing *Holmes v. J. Ray McDermott & Co., Inc.,* 734 F.2d 1110, 1118 (5th Cir. 1984), *cert. denied,* 459 U.S. 1107, 103 S.Ct. 732, 74 L.Ed.2d 956 (1983)); *see, e.g., Robinson v. Pocahontas, Inc.,* 477 F.2d 1048, 1051–52 (1st Cir.1973). The United States Court of Appeals for the Fifth Circuit, however, retreated from this position in *Guevara,* holding that "[d]evelopments in the law ... have caused us to reevaluate the basis for such a punitive award and to conclude that *Holmes* should be overruled.... [W]e are persuaded that punitive damages should no longer be available

in cases of willful nonpayment of maintenance and cure under the general maritime law." 59 F.3d at 1498, 1513; *see also Scarborough v. Clemco Indus.,* 391 F.3d 660, 668 (5th Cir.2004), *cert. denied,* 544 U.S. 999, 125 S.Ct. 1932, 161 L.Ed.2d 772 (2005); *Galveston County Nav. Dist. No. 1 v. Hopson Towing Co.,* 92 F.3d 353, 358 (5th Cir.1996); *Zenon v. Sonat Offshore Drilling, Inc.,* No. Civ. 95–30791, 1996 WL 481274, at *1 (5th Cir. Aug. 12, 1996); *Bush v. Diamond Offshore Co.,* 46 F.Supp.2d 515, 521 (E.D.La.1999) (finding that "if an employer willfully and wantonly fails to pay maintenance and cure to a seaman employee, the seaman may recover past maintenance plus attorney's fees but not punitive damages").

Additionally, willful denial of maintenance and cure does not give rise to a claim for punitive damages by a seaman under the Jones Act. *Guevara,* 59 F.3d at 1512 ("[E]ven if willful behavior is established, the Jones Act does not provide for punitive damages.") (emphasis in original); *Bentley v. Ocean Runner Marine, Inc.,* Civ. A. No. 01–3533, 2002 WL 1379129, at *1 (E.D.La. June 24, 2002) ("Punitive damages are unavailable under the Jones Act or general maritime law in 'any action for maintenance and cure.'") (quoting *Guevara,* 59 F.3d at 1498) (emphasis in original)).

Loftin cites *Vaughan v. Atkinson* for the proposition that "[a]ttorney fees may be considered [as] a form of punitive damages ... in maritime cases." 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). In *Vaughan,* the Supreme Court upheld an award of attorney's fees to a seaman where his employer had deliberately withheld payment of maintenance and cure. *Id.* at 529–31, 82 S.Ct. 997. Deciphering the Court's rationale for awarding the attorney's fees in *Vaughan* has proved problematic; however, the Fifth Circuit has

commented on the Supreme Court's majority opinion, stating:

> Simply put, all we can confidently say about *Vaughan* is that it entitles an injured seaman to recover attorney's fees—perhaps as part of compensatory damages—when his employer willfully fails to pay maintenance and cure. We cannot definitively conclude, however, that *Vaughan* establishes any broader principle to support *Holmes*'s rule that tort-like punitive damages, not limited to attorney's fees, are available in cases of willful nonpayment of maintenance and cure.

*Guevara,* 59 F.3d at 1503. The court further noted that subsequent court rulings have interpreted the fee-shifting aspect of the *Vaughan* award as an exception to the American Rule that each party must pay its own attorney's fees. *Id.* at 1501. The court explained that the exception in *Vaughan* is clearly limited to an award of attorney's fees where the party's conduct constitutes bad faith.[4] *Id.* at 1503 (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 53, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).

Accordingly, accepting the factual allegations of the complaint as true and resolving ambiguities or doubts regarding the sufficiency of the claim in favor of Loftin, the court finds that Loftin has failed to state a claim for punitive damages under the general maritime law or the Jones Act as a matter of law. *See Guevara,* 59 F.3d at 1498; *Bentley,* 2002 WL 1379129, at *1. Even if Loftin is able to establish that he is entitled to recover attorney's fees by showing egregious fault on the part of Kirby, Fifth Circuit precedent makes it clear that Loftin has not set forth a viable claim for punitive damages upon which relief can be granted under any possible theory. *See Guevara,* 59 F.3d at 1503.

### III. *Conclusion*

For the foregoing reasons, Kirby's Motion to Dismiss Claims of Punitive Damages for Failure to State Claim on Which Relief May be Granted is GRANTED.

---

**4.** "[T]here is an escalating scale of liability: a shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages. If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for … attorney's fees as well." *Brown v. Parker Drilling Offshore Corp.,* 410 F.3d 166, 177 (5th Cir.2005), *cert. denied,* 549 U.S. 952, 127 S.Ct. 382, 166 L.Ed.2d 268 (2006) (quoting *Morales v. Garijak, Inc.,* 829 F.2d 1355, 1358 (5th Cir.1987)).