HARBOR TUG & BARGE CO. *v.* PAPAI ET UX.

No. 95–1621.  Argued January 13, 1997—Decided May 12, 1997

*Eric Danoff* argued the cause for petitioner. With him on the briefs was *Richard K. Willard.*

*Thomas J. Boyle* argued the cause and filed a brief for respondents.

*David C. Frederick* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Dellinger, Deputy Solicitor*

General Kneedler, J. Davitt McAteer, Allen H. Feldman, Nathaniel I. Spiller, and Mark S. Flynn.*

JUSTICE KENNEDY delivered the opinion of the Court.

Adjudication to determine whether a maritime employee is a seaman under the Jones Act, 46 U. S. C. App. § 688(a), or a maritime employee covered by the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat. (pt. 2) 1424, as amended, 33 U. S. C. § 901 et seq., continues to be of concern in our system. The distinction between the two mutually exclusive categories can be difficult to implement, and many cases turn on their specific facts.

The Court of Appeals for the Ninth Circuit held in this case that there was a jury question as to whether an injured worker was a Jones Act seaman. Granting the employer's petition for a writ of certiorari, we brought two questions before us. The first is whether an administrative ruling in favor of the employee on his claim of coverage under the LHWCA bars his claim of seaman status in the Jones Act suit he wishes to pursue in district court. The second is whether this record would permit a reasonable jury to conclude the employee is a Jones Act seaman. We resolve the second question in the employer's favor and, as it is dispositive of the case, we do not reach the first.

On the question of seaman status, there is an issue of significance beyond the facts of this case. Our statement in an earlier case that a worker may establish seaman status based on the substantiality of his connection to "an identifiable group of . . . vessels" in navigation, see Chandris, Inc. v.

*Briefs of amici curiae urging reversal were filed for Industrial Indemnity Co. et al. by Roger A. Levy and J. Mark Foley; and for the Shipbuilders Council of America et al. by Charles T. Carroll, Jr., F. Edwin Froelich, Franklin W. Losey, and Lloyd A. Schwartz.

A brief of amicus curiae urging affirmance was filed for the United Brotherhood of Carpenters and Joiners of America by John T. DeCarlo and John R. Hillsman.

*Latsis*, 515 U. S. 347, 368 (1995), has been subject to differing interpretations, and we seek to provide clarification.

I

Respondent John Papai was painting the housing structure of the tug *Pt. Barrow* when a ladder he was on moved, he alleges, causing him to fall and injure his knee. App. 50. Petitioner Harbor Tug & Barge Co., the tug's operator, had hired Papai to do the painting work. *Id.*, at 44. A prime coat of paint had been applied and it was Papai's task to apply the finish coat. *Id.*, at 45. There was no vessel captain on board and Papai reported to the port captain, who had a dockside office. *Id.*, at 36–37. The employment was expected to begin and end the same day, *id.*, at 35, 48, and Papai was not going to sail with the vessel after he finished painting, *id.*, at 51. Papai had been employed by Harbor Tug on 12 previous occasions in the 2½ months before his injury.

Papai received his jobs with Harbor Tug through the Inland Boatman's Union (IBU) hiring hall. He had been getting jobs with various vessels through the hiring hall for about 2¼ years. All the jobs were short term. The longest lasted about 40 days and most were for 3 days or under. *Id.*, at 29, 34. In a deposition, Papai described the work as coming under three headings: maintenance, longshoring, and deckhand. *Id.*, at 30–32. Papai said maintenance work involved chipping rust and painting aboard docked vessels. *Id.*, at 30, 34–35. Longshoring work required helping to discharge vessels. *Id.*, at 31. Deckhand work involved manning the lines on- and off-board vessels while they docked or undocked. *Id.*, at 30. As for the assignments he obtained through the hiring hall over 2¼ years, most of them, says Papai, involved deckhand work. *Id.*, at 34.

After his alleged injury aboard the *Pt. Barrow*, Papai sued Harbor Tug in the United States District Court for the Northern District of California, claiming negligence under

the Jones Act and unseaworthiness under general maritime law, in addition to other causes of action. His wife joined as a plaintiff, claiming loss of consortium. Harbor Tug sought summary judgment on Papai's Jones Act and unseaworthiness claims, contending he was not a seaman and so could not prevail on either claim. The District Court granted Harbor Tug's motion and later denied Papai's motion for reconsideration. After our decisions in *McDermott Int'l, Inc.* v. *Wilander*, 498 U. S. 337 (1991), and *Southwest Marine, Inc.* v. *Gizoni*, 502 U. S. 81 (1991), the District Court granted a motion by Harbor Tug "to confirm" the earlier summary adjudication of Papai's nonseaman status. The District Court reasoned, under a test since superseded, see *Chandris, supra,* that Papai was not a seaman within the meaning of the Jones Act or the general maritime law, because "he did not have a 'more or less permanent connection' with the vessel on which he was injured nor did he perform substantial work on the vessel sufficient for seaman status." App. to Pet. for Cert. 27a.

The Court of Appeals for the Ninth Circuit reversed and remanded for a trial of Papai's seaman status and his corresponding Jones Act and unseaworthiness claims. Based on our decision in *Chandris,* the court described the relevant inquiry as "not whether plaintiff had a permanent connection with the vessel [but] whether plaintiff's relationship with a vessel (or a group of vessels) was substantial in terms of duration and nature, which requires consideration of the total circumstances of his employment." 67 F. 3d 203, 206 (1995). A majority of the panel believed it would be reasonable for a jury to conclude the employee satisfied that test. In the majority's view, "[i]f the type of work a maritime worker customarily performs would entitle him to seaman status if performed for a single employer, the worker should not be deprived of that status simply because the industry operates under a daily assignment rather than a permanent employment system." *Ibid.* The majority also said the

"circumstance" that Papai had worked for Harbor Tug on 12 occasions during the 2½ months before his injury "may in itself provide a sufficient connection" to Harbor Tug's vessels to establish seaman status. *Ibid.*

Judge Poole dissented from the majority's holding that there was a triable issue as to Papai's seaman status. He recognized that *Chandris* held out the possibility of being a seaman without a substantial connection to a particular vessel in navigation, provided one nevertheless had the required connection to "'an identifiable group of such vessels.'" 67 F. 3d, at 209 (quoting 515 U. S., at 368). Judge Poole said, however, it would be a mistake to view *Chandris* as holding that, for seaman-status purposes, a "group may be identified simply as those vessels on which a sailor sails, not just those of a particular employer or controlling entity. . . . Th[e majority's holding] renders the 'identifiable group' or 'fleet' requirement a nullity." 67 F. 3d, at 209 (citation omitted). Judge Poole also noted that the majority's position conflicted with that of the Fifth Circuit (en banc) and of a Third Circuit panel. *Ibid.* (citing *Barrett* v. *Chevron, U. S. A., Inc.,* 781 F. 2d 1067 (CA5 1986) (en banc); *Reeves* v. *Mobile Dredging & Pumping Co.,* 26 F. 3d 1247 (CA3 1994)); see also *Johnson* v. *Continental Grain Co.,* 58 F. 3d 1232 (CA8 1995); but see *Fisher* v. *Nichols,* 81 F. 3d 319, 323 (CA2 1996) (rejecting common ownership or control requirement).

We granted certiorari, 518 U. S. 1055 (1996), and now reverse.

## II

The LHWCA, a maritime workers' compensation scheme, excludes from its coverage "a master or member of a crew of any vessel," 33 U. S. C. § 902(3)(G). These masters and crewmembers are the seamen entitled to sue for damages under the Jones Act. *Chandris,* 515 U. S., at 355–358. In other words, the LHWCA and the Jones Act are "mutually exclusive." *Id.,* at 355–356.

Our recent cases explain the proper inquiry to determine seaman status. We need not restate that doctrinal development, see *id.*, at 355–368; *Wilander, supra,* at 341–354, to resolve Papai's claim. It suffices to cite *Chandris,* which held, in pertinent part:

> "[T]he essential requirements for seaman status are twofold. First, . . . an employee's duties must contribut[e] to the function of the vessel or to the accomplishment of its mission. . . .
>
> "Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." 515 U. S., at 368 (citations and internal quotation marks omitted).

The seaman inquiry is a mixed question of law and fact, and it often will be inappropriate to take the question from the jury. Nevertheless, "summary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Wilander, supra,* at 356; see also *Chandris,* 515 U. S., at 368–369.

Harbor Tug does not dispute that it would be reasonable for a jury to conclude Papai's duties aboard the *Pt. Barrow* (or any other vessel he worked on through the IBU hiring hall) contributed to the function of the vessel or the accomplishment of its mission, satisfying *Chandris'* first standard. Nor does Harbor Tug dispute that a reasonable jury could conclude that the *Pt. Barrow* or other vessels Papai worked on were in navigation. The result, as will often be the case, is that seaman status turns on the part of *Chandris'* second standard which requires the employee to show "a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.*, at 368. We explained the rule as follows:

"The fundamental purpose of th[e] substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection with a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Ibid.*

For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea. This will give substance to the inquiry both as to the duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees.

Papai argues, and the Court of Appeals majority held, that Papai meets *Chandris*' second test based on his employments with the various vessels he worked on through the IBU hiring hall in the 2¼ years before his injury, vessels owned, it appears, by three different employers not linked by any common ownership or control, App. 38. He also did longshoring work through the hiring hall, *id.*, at 31, and it appears this was for still other employers, *id.*, at 38. As noted above, Papai testified at his deposition that the majority of his work during this period was deckhand work. According to Papai, this satisfies *Chandris* because the group of vessels Papai worked on through the IBU hiring hall constitutes "an identifiable group of . . . vessels" to which he has a "substantial connection." 515 U. S., at 368.

The Court of Appeals for the Fifth Circuit was the first to hold that a worker could qualify as a seaman based on his connection to a group of vessels rather than a particular one. In *Braniff* v. *Jackson Ave.-Gretna Ferry, Inc.*, 280 F. 2d 523 (1960), the court held the employer was not entitled to summary judgment on the seaman-status question where an

employee's job was to perform maintenance work on the employer's fleet of ferry boats, often while the boats were running: "The usual thing, of course, is for a person to have a Jones Act seaman status in relation to a particular vessel. But there is nothing about this . . . concept to limit it mechanically to a single ship." *Id.*, at 528. There is "no insurmountable difficulty," the court explained, in finding seaman status based on the employee's relationship to "several specific vessels"—"an identifiable fleet"—as opposed to a single one. *Ibid.*

We, in turn, adverted to the group of vessels concept in *Chandris.* We described it as a rule "allow[ing] seaman status for those workers who had the requisite connection with an 'identifiable fleet' of vessels, a finite group of vessels under common ownership or control." 515 U. S., at 366. The majority in the Court of Appeals did not discuss our description of the group of vessels concept as requiring common ownership or control, nor did it discuss other Courts of Appeals cases applying the concept, see, *e. g., Reeves* v. *Mobile Dredging & Pumping Co.*, 26 F. 3d, at 1258. The court pointed to this statement from *Chandris:* "[W]e see no reason to limit the seaman status inquiry . . . exclusively to an examination of the overall course of a worker's service with a particular employer." 515 U. S., at 371–372. It interpreted this to mean "it may be necessary to examine the work performed by the employee while employed by different employers during the relevant time period." 67 F. 3d, at 206. The court did not define what it meant by "the relevant time period." In any event, the context of our statement in *Chandris* makes clear our meaning, which is that the employee's prior work history with a particular employer may not affect the seaman inquiry if the employee was injured on a new assignment with the same employer, an assignment with different "essential duties" from his previous ones. 515 U. S., at 371. In *Chandris,* the words "particular employer" give emphasis to the point that the inquiry into the nature

of the employee's duties for seaman-status purposes may concentrate on a narrower, not broader, period than the employee's entire course of employment with his current employer. There was no suggestion of a need to examine the nature of an employee's duties with prior employers. See also *id.*, at 367 ("Since *Barrett* [v. *Chevron, U. S. A., Inc.*, 781 F. 2d 1067 (CA5 1986) (en banc)], the Fifth Circuit consistently has analyzed the problem [of determining seaman status] in terms of the percentage of work performed on vessels for the employer in question"). The Court of Appeals majority interpreted the words "particular employer" outside the limited discussion in which we used them and, as a result, gave the phrase a meaning opposite from what the context requires.

The Court of Appeals stressed that various of Papai's employers had "join[ed] together to obtain a common labor pool on which they draw by means of a union hiring hall." 67 F. 3d, at 206; see also *id.*, at 206, n. 3 (suggesting that this case involves a "group of vessels [that] have collectively agreed to obtain employees" from a hiring hall). There is no evidence in the record that the contract Harbor Tug had with the IBU about employing deckhands (IBU Deckhands Agreement) was negotiated by a multiemployer bargaining group, and, even if it had been, that would not affect the result here. There was no showing that the group of vessels the court sought to identify were subject to unitary ownership or control in any aspect of their business or operation. So far as the record shows, each employer was free to hire, assign, and direct workers for whatever tasks and time period they each determined, limited, at most, by the IBU Deckhands Agreement. In deciding whether there is an identifiable group of vessels of relevance for a Jones Act seaman-status determination, the question is whether the vessels are subject to common ownership or control. The requisite link is not established by the mere use of the same hiring hall which draws from the same pool of employees.

Considering prior employments with independent employers in making the seaman-status inquiry would undermine "the interests of employers and maritime workers alike in being able to predict who will be covered by the Jones Act (and, perhaps more importantly for purposes of the employers' workers' compensation obligations, who will be covered by the LHWCA) before a particular work day begins." *Chandris, supra,* at 363. There would be no principled basis for limiting which prior employments are considered for determining seaman status. The Court of Appeals spoke of a "relevant time period" but, as noted above, it did not define this term. Since the substantial connection standard is often, as here, the determinative element of the seaman inquiry, it must be given workable and practical confines. When the inquiry further turns on whether the employee has a substantial connection to an identifiable group of vessels, common ownership or control is essential for this purpose.

Papai contends his various employers through the hiring hall would have been able to predict his status as a seaman under the Jones Act based on the seagoing nature of some of the duties he could have been hired to perform consistent with his classification as a "qualified deckhand" under the IBU Deckhands Agreement. By the terms of the agreement, Papai was qualified as a "satisfactory helmsman and lookout," for example, and he could have been hired to serve a vessel while it was underway, in which case his duties would have included "conduct[ing] a check of the engine room status a minimum of two (2) times each watch . . . for vessel safety reasons." App. 77. In *South Chicago Coal & Dock Co.* v. *Bassett,* 309 U. S. 251 (1940), we rejected a claim to seaman status grounded on the employee's job title, which also happened to be "deckhand." "The question," we said, "concerns his actual duties." *Id.,* at 260. See also *Northeast Marine Terminal Co.* v. *Caputo,* 432 U. S. 249, 268, n. 30 (1977) (reasoning that employee's membership in longshoremen's union was, in itself, irrelevant to whether employee

was covered by the LHWCA, as fact of union membership was unrelated to the purposes of the LHWCA's coverage provisions). The question is what connection the employee had in actual fact to vessel operations, not what a union agreement says. Papai was qualified under the IBU Deckhands Agreement to perform nonseagoing work in addition to the seagoing duties described above. His actual duty on the *Pt. Barrow* throughout the employment in question did not include any seagoing activity; he was hired for one day to paint the vessel at dockside and he was not going to sail with the vessel after he finished painting it. App. 44, 48, 51. This is not a case where the employee was hired to perform seagoing work during the employment in question, however brief, and we need not consider here the consequences of such an employment. The IBU Deckhands Agreement gives no reason to assume that any particular percentage of Papai's work would be of a seagoing nature, subjecting him to the perils of the sea. In these circumstances, the union agreement does not advance the accuracy of the seaman-status inquiry.

Papai argues he qualifies as a seaman if we consider his 12 prior employments with Harbor Tug over the 2½ months before his injury. Papai testified at his deposition that he worked aboard the *Pt. Barrow* on three or four occasions before the day he was injured, the most recent of which was more than a week earlier. *Id.*, at 35, 44. Each of these engagements involved only maintenance work while the tug was docked. *Id.*, at 34–35. The nature of Papai's connection to the *Pt. Barrow* was no more substantial for seaman-status purposes by virtue of these engagements than the one during which he was injured. Papai does not identify with specificity what he did for Harbor Tug the other eight or nine times he worked for the company in the 2½ months before his injury. The closest he comes is his deposition testimony that 70 percent of his work over the 2¼ years before his injury was deckhand work. *Id.*, at 34. Coupled with

the fact that none of Papai's work aboard the *Pt. Barrow* was of a seagoing nature, it would not be reasonable to infer from Papai's testimony that his recent engagements with Harbor Tug involved work of a seagoing nature. In any event, these discrete engagements were separate from the one in question, which was the sort of "transitory or sporadic" connection to a vessel or group of vessels that, as we explained in *Chandris*, does not qualify one for seaman status. 515 U. S., at 368.

Jones Act coverage is confined to seamen, those workers who face regular exposure to the perils of the sea. An important part of the test for determining who is a seaman is whether the injured worker seeking coverage has a substantial connection to a vessel or a fleet of vessels, and the latter concept requires a requisite degree of common ownership or control. The substantial connection test is important in distinguishing between sea- and land-based employment, for land-based employment is inconsistent with Jones Act coverage. This was the holding in *Chandris*, and we adhere to it here. The only connection a reasonable jury could identify among the vessels Papai worked aboard is that each hired some of its employees from the same union hiring hall from which Papai was hired. That is not sufficient to establish seaman status under the group of vessels concept. Papai had the burden at summary judgment to "set forth specific facts showing that there is a genuine issue for trial." Fed. Rule Civ. Proc. 56(e). He failed to meet it. The Court of Appeals erred in holding otherwise. Its judgment is reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE BREYER join, dissenting.

During the 2-year period immediately before his injury, respondent Papai worked as a maintenance man and a deck-hand for various employers who hired out of the Inland Boat-

man's Union hiring hall. He testified that about 70 percent of his work was as a deckhand, and that "most of that work [was] done while the boats were moving on the water." App. 34. If all of that deckhand work had been performed for petitioner, there would be no doubt about Papai's status as a seaman.

Petitioner, however, did not maintain a permanent crew on any of its vessels. 67 F. 3d 203, 204 (CA9 1995). Instead, like other tugboat operators in the San Francisco Bay area, it obtained its deckhands on a job-by-job basis through the union hiring hall. Under these circumstances, I believe the Court of Appeals correctly concluded that Papai's status as a seaman should be tested by the character of his work for the group of vessel owners that used the same union agent to make selections from the same pool of employees.

In *Chandris, Inc.* v. *Latsis,* 515 U. S. 347 (1995), the Court rejected a "voyage test" of seaman status, concluding that an employee who was injured while performing his duties on a vessel on the high seas was not necessarily a Jones Act seaman. *Id.,* at 358–364. The Court instead adopted a status-based inquiry that looked at the nature and duration of the employee's relationship to a vessel—or an identifiable group of vessels—in navigation to determine whether that employee received Jones Act coverage. *Id.,* at 370–371. Today, the majority apparently concludes that an employee is not necessarily protected by the Jones Act even if he was injured aboard a vessel in navigation *and* his work over the preceding two years was primarily seaman's work. I believe this conclusion is unsupported by either the reasoning or the language in the *Chandris* opinion.

*Chandris'* status-based test requires a maritime worker to have a relationship that is substantial in duration and nature with a vessel, or an identifiable group of vessels, in navigation. See *id.,* at 376. Nothing in the Court's holding there intimated that the "identifiable group of vessels" need all be

owned by the same person.[1]  Particularly in a labor market designed to allow employers to rely on temporary workers for a range of jobs, there is "no reason to limit the seaman status inquiry . . . exclusively to an examination of the overall course of a worker's service with a particular employer." *Id.*, at 371–372.  As the Court of Appeals observed in this case: "If the type of work a maritime worker customarily performs would entitle him to seaman status if performed for a single employer, the worker should not be deprived of that status simply because the industry operates under a daily assignment rather than a permanent employment system."  67 F. 3d, at 206.

The unfairness created by the Court's rule is evident. Let us assume that none of the tugboat operators in the bay area have permanent crews and that all of them obtain their deckhands on a more or less random basis through the same hiring hall.  Further, assume that about 70 percent of the work performed by the employees thus obtained is seaman's work, while the remainder is shore-based maintenance work. A typical employee working for a typical employer in that pool would have the status of a seaman, and both the employees and the employers would be aware of this reality about their work environment.  But under the Court's reasoning, even if over 70 percent of his randomly selected assignments during a 2-year period were seaman assignments, an injured worker would not be a seaman for Jones Act purposes if he happened to receive only a few assignments with the owner of the particular boat on which he was injured and those assignments were not seaman's work.

---

[1] The majority puts great weight on *Chandris'* description of the Fifth Circuit's case law developing the fleet doctrine as "modif[ying] the test to allow seaman status for those workers who had the requisite connection with an 'identifiable fleet' of vessels, a finite group of vessels under common ownership or control." *Chandris*, 515 U. S., at 366.  See *ante*, at 556.  But that description of the lower court's case law did not form part of the *Chandris* holding, and it should not control the outcome here.

The majority tries to justify this conclusion with the argument that a rule acknowledging an employee's status as a seaman based on the work he does for a number of employers who hire out of the same hiring hall would create uncertainties for employers. *Ante*, at 558. The Court's concern is that an employer might not realize that an employee he had selected to chip paint on a docked boat had spent most of the past year as a deckhand on a neighboring vessel. This fear is exaggerated, since an employer who hires its workers out of a union hiring hall should be presumed to be familiar with the general character of their work. Moreover, surely the unfairness created by the majority's rule outweighs this concern.

Of course, in order to hold a particular employer liable, an employment relationship must have existed between the worker and the particular vessel owner at the time of the injury. *Chandris* teaches us, however, that the specific activity being performed at the time of the injury is not sufficient to establish the employee's status under the Jones Act. Rather, we must determine whether an employee has seaman status by looking at his work history. The character of that history in the market from which a vessel owner obtains all of its crews seems to me just as relevant as the assignments to the particular operator for whom work was being performed when the injury occurred.

Accordingly, I would affirm the judgment of the Court of Appeals.[2]

---

[2] On the question the Court does not reach, I think the Court of Appeals correctly interpreted our opinion in *Southwest Marine, Inc.* v. *Gizoni*, 502 U. S. 81 (1991). See also G. Gilmore & C. Black, Law of Admiralty 435 (2d ed. 1975).