**Noe LARA, Plaintiff,**

v.

**ARCTIC KING LTD. d/b/a Arctic King Fisheries, and the F/V Arctic Trawler, her engines tackle, gear, apparel, furniture, and equipment, Defendants.**

**No. C99–1756.**

United States District Court, W.D. Washington, at Seattle.

May 25, 2001.

Georgia Trejo Locher, Seatac, WA, Eric C. de los Santos, Gerogis Trejo Locher, Seatac, WA, for plaintiff.

Marc E. Warner, Dennis Michael Moran, Legros, Buchanan & Paul, Seattle, WA, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

McGOVERN, District Judge.

This matter was tried before the Court, without a jury, on April 9 through 11, 2001. Based upon the testimony and exhibits presented, and upon application of the relevant law, the Court makes the following findings and conclusions.

---

## FINDINGS OF FACT

This is a suit for damages brought under the Merchant Marine Act of 1920, 46 U.S.C. § 688 (commonly referred to as the "Jones Act") and the general maritime law concept of "unseaworthiness" relating to personal injuries that plaintiff sustained while working aboard the defendant's vessel on December 17, 1997. Plaintiff also brings claims related to the traditional seaman's benefits of maintenance, cure and unearned wages.

The initial prerequisite for recovery on any of plaintiff's claims in this matter is that plaintiff was a "seaman" at the time of his accident.

Plaintiff is a 36 year old gentleman who has had a number of jobs involving physical labor. Some of those jobs have been for various fishing companies, some of which involved working ashore and others involved plaintiff serving as a member of vessels' crews when the vessels operated at sea.

In August 1997, plaintiff applied for a job with, and was hired by, the defendant. Plaintiff had never previously worked for the defendant. He testified that he applied for a position as a processor aboard one of defendant's vessels, and was apparently given or shown a document describing the job of a processor, although plaintiff never signed on the designated signature line on that document. Plaintiff testified he had no fixed position when hired by the defendant. Pauline Chihara who was in charge of personnel for the defendant at that time and who interviewed and hired plaintiff, testified she advised plaintiff that he was employed only to perform work aboard defendant's vessel, ARCTIC TRAWLER, while it was in a shipyard in Lake Union. Lake Union is located on the outskirts of downtown Seattle, with access to Puget Sound by way of a canal and a set of locks.

The ARCTIC TRAWLER had arrived at the shipyard for repair and maintenance work in May of 1997, three months before plaintiff was hired. The vessel had been fishing in Russian waters for the prior two years, without much in the way of repairs and maintenance during that time, and was in need of substantial removal of rust and repainting. In addition, the defendant had decided to sell the vessel, and much of the work being performed at the shipyard was to place it in a saleable condition.

Plaintiff worked as a day laborer aboard the vessel from early August 1997 until January 2, 1998. His work was performed exclusively aboard the vessel. Throughout that entire time, the vessel was afloat in navigable water of the United States, but was tied to a pier at the shipyard. On one or more occasions, the vessel was shifted along the pier, or between piers at the shipyard, but this work was performed by shipyard employees. Much of plaintiff's work consisted of scrapping or chipping rust from portions of the vessel, and then priming and painting those areas. He also on occasion operated a vessel crane to move nets and other materials on board.

At no time while plaintiff was employed by the defendant did the vessel leave the shipyard, or engage in fishing or processing activities. Plaintiff testified he never sailed with the vessel, never performed any processing work, and described his job as entailing labor-type work.

Plaintiff signed no crew contract or any other type of employment agreement with the defendant. He punched in and out each work day on a time clock and was paid on an hourly basis. This contrasts with the manner in which crew members of the vessel were paid by way of crew shares—that is, a percentage of the value of fish caught and processed.

Plaintiff slept aboard the vessel, at least during week nights. However, this was as an accommodation to him by the defendant, since plaintiff's home was in Central Washington, several hours travel time from Seattle. Plaintiff was also allowed to eat meals aboard the vessel, but unlike the situation with crewmembers, plaintiff had to purchase and prepare his own food.

During the entire time plaintiff was working aboard the vessel, no man overboard, fire or other safety drills required by the U.S. Coast Guard to be performed by a vessel's crew were conducted.

Throughout the time the vessel was moored at the Lake Union shipyard, the defendant maintained insurance on the vessel under a "port risk" status, as opposed to the degree of coverage in place when the vessel was operating.

During the first two months of plaintiff's employment, defendant had a contract to sell the vessel to another company. There had been discussions between the defendant and that prospective buyer about defendant possibly operating the vessel for the other company after the sale was completed, and taking the vessel out fishing in January 1998. If this had occurred, the defendant would have hired crewmembers to man the vessel. However, there was no agreement or even any firm understanding that the defendant would do so.

Plaintiff testified that before he actually started working for the defendant aboard the vessel, he had been told the vessel was being readied to go fishing in January 1998; and it seems likely that he was hopeful of securing a crew position if and when that occurred, based upon showing good performance of the repair and maintenance work.

In early October of 1997, the prospective purchaser backed out of the vessel purchase. Mr. Rick Rees, the defendant's President at that time, testified that from that point on, defendant's goal was to put the vessel into a presentable condition and to sell it, without retaining any control or involvement.

Mr. Rees testified that shortly after the sale of the vessel fell through, he held a meeting aboard the vessel to so advise all the workers, and to advise that they should expect to be laid-off by the end of that year, 1997. This account was substantiated by the deposition—perpetuated testimony of Roy Wittke who was one of plaintiff's supervisors.

Plaintiff's actions from that point on clearly indicate he was aware his involvement with the vessel was short-lived and that he was not expecting to sail as a crewmember. He applied for crew positions with two other fishing companies in November of 1997 about a month before his accident. He actually was offered and accepted a crew position with one of those companies, but that position never materialized due to mechanical problems experienced by that other company's vessel.

On December 17, 1997, while removing survival suits from a metal container on deck, the metal lid of that container fell and struck plaintiff on the head. There was conflicting evidence as to exactly how the accident occurred, but an eye-witness, plaintiff's cousin, testified that a gust of wind and to a lesser extent, the resulting motion of the vessel caused the container lid to fall. The insurance adjuster who investigated the claim testified that he has checked the weather records for that day and found there was wind of up to 40 mph.

A short time after the accident, plaintiff walked off the vessel and was driven to a medical clinic for an examination. He continued working aboard the vessel for two more weeks, until January 2, 1998 when he and the other laborers were laid off. The vessel remained tied to the shipyard pier

for another eleven months until it was sold to another company in November 1998. The defendant did not operate or crew the vessel during that period, and did not retain any involvement with the vessel after its sale.

### CONCLUSIONS OF LAW

The U.S. Supreme Court has held that a "seaman" is one whose employment furthers the purpose of the vessel or who performs the ship's work. *McDermott International v. Wilander*, 498 U.S. 337, 346 and 355, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). However, in the very same case, the Court made it clear that not every person who performs work aboard a vessel or furthers a vessel's purpose is a "seaman".

> .... with the passage of the LHWCA [the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. § 801 *et. seq.*] Congress established a clear distinction between land-based and sea-based maritime workers ... the Jones Act and the LHWCA are mutually exclusive. The LHWCA provides relief for land-based maritime workers, and the Jones Act is restricted to a "master or member of a crew of any vessel.": "We must take it that the effort of these provisions of the [LHWCA] is to confine the benefits of the Jones Act to the members of the crew of a vessel plying navigable water ..." Whether under the Jones Act or general maritime law, seamen do not include land-based workers.

498 U.S. at 347 and 348, 111 S.Ct. 807 (quoting from *Swanson v. Marra Brothers, Inc.*)

Four years later, the Court again emphasized the distinction that must be made between sea-based employees on the one hand and land-based employees who happen to have been working aboard a vessel. Only the former are to be treated as "seamen". In defining a sea-based employee/seaman, the Court expanded upon the second part of the two-part "seaman" status test set-out in *Wilander*—that is that a "seaman" must have a connection to a vessel in navigation that is substantial in terms of both duration and nature. As to what constitutes a vessel connection that is substantial in nature, the Court stated that:

> The Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to "the special hazards and disadvantages to which they who go down to sea in ships are subjected ..." In our view, "the total circumstances of the individual's employment must be weighted in determining whether he had a sufficient relationship to the navigation of vessels and the perils attendant thereon."

*Chandris Inc. v. Latsis*, 515 U.S. 347, 370, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995)

Two years later, the Court explained that,

> For the substantial connection requirement [articulated in *Chandris*] to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea. This will give substance to the inquiry both as to duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees.

*Harbor Tug and Barge Company v. Papai*, 520 U.S. 548, 555, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997)

Therefore, the Supreme Court has instructed that one of the requirements for "seaman" status is that the employee have been regularly exposed to the "special hazards and disadvantages" of sea duty (*Chandris*) and that, in this regard, the

key factor that must be considered is whether or not the employee's duties took him to sea (*Harbor Tug* ). Under these guidelines, plaintiff's employment with the defendant was not as a seaman.

It is undisputed that plaintiff never went to sea while in defendant's employ. His work was aboard a vessel that remained secured to a pier in a shipyard the entire time. The fact the vessel was shifted along or between piers at the shipyard at various times did not constitute going to sea.

Beyond the fact plaintiff never went to sea in defendant's employ, the evidence indicates he was not subject to the "special hazards and disadvantages" of sea duty. Plaintiff has emphasized the evidence that a gust of wind caused the container lid to fall and strike him. But wind gusts affect land-based and sea-based workers alike, and cannot be characterized as a "special hazard" of seamen.

The fact the vessel remained tied to a pier obviously eliminated many of the peculiar risks that seamen face, such as the need to fight fires without outside assistance, the need to abandon ship, and the need to survive exposure to the elements until help arrives. The fact none of the usual drills as to those hazards were conducted during plaintiff's employment attests to the fact those hazards were not part of plaintiff's work environment. The facts that defendant had adjusted the vessel's insurance coverage to a "port risk" basis is further recognition of the reduced risks to which the vessel, and those working onboard, were subjected.

Another seaman hazard or disadvantage that plaintiff did not face was potential delay or inconvenience in being transported to medical attention for injuries. When plaintiff was injured, he simply walked onto the shipyard pier and was driven to a medical clinic.

Although plaintiff slept aboard the vessel and prepared and ate his meals there, this was simply an accommodation granted him by the defendant, not a requirement of the job. He was free to pursue his own interests ashore after work hours, although there was a 10:00 p.m. curfew owing to the access limitations at the shipyard. He was an at-will day laborer with no contract, and had the legal and actual ability to quit his job and depart his work place at any time. He therefore did not have any of the inconveniences, limitations and pressures encountered by seamen who are often stuck with their vessel and the control of its Master and operator for extended periods until the next port call.

Plaintiff has emphasized he had been lead to believe there was a substantial chance he would be hired as member of the vessel's crew when repairs were completed and the vessel returned to fishing. Such an expectation is immaterial since the determination of "seaman" status does not turn upon ". . . probable or expectant seaman, but seamen in being." *Desper v. Starved Rock Ferry Company*, 342 U.S. 187, 190–191, 72 S.Ct. 216, 96 L.Ed. 205 (1952); *see Sologub v. City of New York*, 202 F.3d 175, 181 (2nd Cir.2000).

Moreover, the weight of the evidence is that plaintiff did not have, or at least should not have had, a significant expectation of a crew position. The Court is impressed with the testimony of the individual who interviewed and hired plaintiff, Ms. Chihara, to the effect that plaintiff was told the job was only shipyard labor with no guaranty of a crew position to follow. The vessel was for sale, with the attendant uncertainties as to any further operations under the defendant's ownership or control. Plaintiff testified he had no title when employed by the defendant, and de-

scribed his activities simply as labor-type work.

By at least the month before his accident, plaintiff testified he was aware his employment would be terminated shortly; and he interviewed with at least two other fishing companies for jobs.

It is clear plaintiff neither went to sea nor was exposed to the special hazards and disadvantages of a seaman. Therefore, plaintiff was not a seaman but was rather a shore-based harbor worker.

Lacking seaman status, plaintiff is not entitled to pursue damage claims against the defendant, his employer, under either the Jones Act or the doctrine of unseaworthiness, or to pursue claims related to the seaman's benefits of maintenance, cure and unearned wages. See *Swanson v. Marra Brothers*, 328 U.S. 1, 7, 66 S.Ct. 869, 90 L.Ed. 1045 (1946) (as to no Jones Act recovery); *Garrett v. United States Lines, Inc.*, 574 F.2d 997, 1000 (9th Cir. 1978) (as to no recovery under for unseaworthiness); *Gypsum Carrier Inc. v. Handelsman*, 307 F.2d 525, 529 (9th Cir.1962) (as to no recovery related to maintenance, cure or unearned wages).

Therefore, it is ordered that judgment be entered for the defendant in this matter.

### JUDGMENT

Pursuant to the bench trial of this matter and based upon the resulting Findings of Fact and Conclusions of Law, judgment is hereby granted for the defendant.