| THIBODEAUX, Judge.
Heath Buford, plaintiff, sustained a knee injury at an offshore work site in the course of his employment with defendant, Cardinal Services, Inc. (now known as Superior Energy Services, L.L.C.), as a wire-line helper on a 150 foot self-elevating lift boat. Mr. Buford filed suit against his employer and B.T. Operating Company. Cardinal Services, Inc. moved for summary judgment, challenging Mr. Buford’s seaman status under the Jones Act, 46 U.S.C.App. § 688. The trial court granted the motion.
Mr. Buford appeals. The sole issue is his seaman status under the Jones Act. We reverse and remand for trial on the merits. For the reasons which follow, there are genuine issues of material fact relative to Mr. Buford’s status as a seaman.
I.

ISSUE

We shall consider whether the trial court erred in concluding that genuine issues of material fact did not exist and Cardinal Services, Inc. was entitled to judgment as a matter of law regarding Mr. Buford’s seaman status under the Jones Act.
II.

FACTS AND PROCEDURAL HISTORY

Cardinal Services, Inc. (now known as Superior Energy Services, L.L.C. and hereinafter referred to as “Cardinal”) services oil and gas industry operations in Louisiana, Texas, and the Gulf of Mexico. Wireline operations is one of many | ¡^services the company provides. When hired by Cardinal in February 1998, Mr. Buford was assigned to the company’s wireline department as a wireline helper.
While employed at Cardinal, Mr. Buford worked on five different Cardinal-owned and controlled vessels exclusively, namely, the M/V Cardinal III, the L/B R.E. Johnson, the L/B J.W. Collins, the L/B T.C. Holleman, and the L/B J.A. Holleman. He did not work upon any vessel owned by any company or business other than Cardinal. Mr. Buford’s responsibilities to his employer were varied and, as a wireline helper in the service of oil wells, often at the request of the wireline operator. He maintained both the wireline and the down hole equipment. He also cleaned the work area and platform, lubricated, and painted. Some of these tasks were performed on *1272 land, some on fixed platforms and some on vessels.
Depending on agreements with and requests from Cardinal’s oil company customers, wireline operations were often performed at a number of different job locations owned and operated by those customers. Cardinal’s daily operation reports document Mr. Buford’s work and his working hours. Cardinal submits that according to these reports and according to Mr. Buford’s pre-trial deposition, over 55 percent of Mr. Buford’s work was performed either in the Cardinal shop (22.25 percent) or while performing wireline work on a fixed platform where no vessel was involved (33.14 percent). Cardinal also submits that Mr. Buford performed wireline services on wells from the M/V Cardinal III (a spud barge with a built-in wireline unit), the L/B T.C. Holleman (another spud barge with built-in wireline unit), and the L/B J.W. Collins (a 65 foot lift boat with a built-in wireline unit). The spud barges and the lift boat were used to perform small platform wireline operations and, according to Mr. Buford, are operated by a two-person wireline crew, of which he was a member. According to the daily operations reports, the work upon |sthese three vessels constituted 27.30 percent of his employment time. Moreover, the seven days in Cardinal’s marine division spent as a deckhand aboard the L/B R.E. Johnson assisting the short-handed crew account for 10.21 percent. Finally, the assignment with the L/B J.A. Holleman (150 foot self-elevating lift boat with a wireline unit on its deck), which resulted in Mr. Buford’s injury, accounts for 4.62 percent of his total working hours.
On June 8, 1998, Mr. Buford was transported by helicopter to a work site comprised of the Cardinal-owned and controlled lift-boat, the L/B J.A. Holleman, and a fixed offshore platform, East Cameron 72. The vessel was jacked up and affixed adjacent to the platform; a catwalk connected the two. Mr. Buford slept on the stationary vessel over the course of three nights and also took his meals there. The vessel had a captain, mate, deckhand, and cook, all of whom comprised the crew, and of which Mr. Buford was not a member. Over the course of four days, he worked as a wireline helper, primarily on the platform, assisting Mr. Andrew Co-meaux, the wireline operator. The wireline unit was located on the deck of the L/B J.A. Holleman. In addition to housing the wireline unit, the vessel also served as a work-staging area. The wireline unit was used to service the well, and the well was accessed via the platform.
On June 11, 1998, Mr. Buford and Mr. Coméame were aboard the vessel, operating the wireline unit, and attempting to pull the safety valve out of the well and up into the lubricator. The men were successful in latching onto the valve with the wireline unit, but were unable to pull it into the lubricator. They disembarked the vessel and proceeded to the platform where Mr. Comeaux placed a pipe wrench into the grating to provide leverage for Mr. Buford’s foot. Mr. Buford tried to loosen the valve by pulling the wire back and forth. In attempting this, Mr. Buford lifted his left |4leg to create greater force and upon placing his foot back down, his left leg gave way and he twisted his knee. He was flown by helicopter from the work site to receive medical attention for what was discovered to be a torn medial meniscus. He has undergone two surgeries and has received compensation and medical benefits pursuant to the Longshore and Harbor Workers’ Compensation Act, 33 U.S.C. § 901. Mr. Buford filed suit against both Cardinal and B.T. Operating Company on April 7, 1999. In his petition for damages, he alleged that he was a seaman as contemplated by the Jones Act, *1273 46 U.S.C.App. § 688. After the two defendants both answered, the claims against B.T. Operating Company were voluntarily dismissed by Mr. Buford. Cardinal, the remaining defendant, filed a motion for summary judgment urging lack of seaman status. The trial judge granted the motion in favor of Cardinal and Mr. Buford filed this appeal.
III.

LAW AND DISCUSSION

Standard of Review
We begin with the well-settled rule that “Mppellate courts review summary judgments de novo under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate.” Reynolds v. Select Properties, Ltd., 93-1480, p. 2 (La.4/11/94); 634 So.2d 1180, 1183; Leger v. La. Med. Mut. Ins. Co., 98-1098, p. 4 (La.App. 3 Cir. 3/31/99); 732 So.2d 654, 657, writ denied, 99-1253 (La.6/18/99); 745 So.2d 30. Stated differently, this court “asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover-appellant is entitled to judgment as a matter of law.” Labbe v. Chem. Waste Management, Inc., 00-1772, p. 4-5 (La.App. 3 Cir. 5/2/01); 786 So.2d 868, 872, writ denied, 2001-1602 (La.9/14/01); 796 So.2d 685 (quoting Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 26 (La.7/5/94); 639 So.2d 730, 750).
Because this is a summary judgment case to which La.Code Civ.P. art. 966 et seq. is applicable, it is necessary to first determine who will bear the burden of proof at trial. Subpart (C)(2) of La.Code Civ.P. art. 966 explains that
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
The Jones Act, 46 U.S.CApp. § 688(a) mandates that “[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law....” While the Act affords an injured seaman the right to maintain an action, it is silent as to the definition of “seaman.” The Act “therefore leaves to the courts the determination of exactly which maritime workers are entitled to admiralty’s special protection.” Chandris, Inc. v. Latsis, 515 U.S. 347, 355, 115 S.Ct. 2172, 2183, 132 L.Ed.2d 314 (1995). An employee need not perform traditional maritime activities to be considered a seaman. Indeed, as Cardinal conceded at oral argument, it is possible, under certain circumstances, for a wireline helper to achieve seaman status.
In keeping with the jurisprudential development of admiralty law, Mr. Buford has the burden of proving the elements of a twofold, conjunctive test for |fiseaman status. “First, ... ‘an employee’s duties must “contribut[e] to the function of the vessel or to the accomplishment of its mission.” ’ ... Second, ... a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its *1274 duration and its nature.” Chandris, 515 U.S. at 368, 115 S.Ct. at 2190 (citation omitted). See also Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 554, 117 S.Ct. 1535, 1540, 137 L.Ed.2d 800 (1997); Roberts v. Cardinal Services, 266 F.3d 368, 374 (5th Cir.2001).
Because Cardinal is the movant and it is not to bear the burden of proof at trial on seaman status under the Jones Act, it is not required to negate all essential elements of the Mr. Buford’s claims. The company must show an absence of factual support for one or more elements essential to the Mr. Buford’s claims. If Cardinal is able to do this, then the burden of production shifts to Mr. Buford to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If Mr. Buford successfully produces such support, then there is a genuine issue of material fact.
In a Jones Act case, the determination of seaman status is a mixed question of law and fact. Papai, 520 U.S. 548, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997); Chandris, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314; Roberts, 266 F.3d at 373. And if reasonable persons could reach only one conclusion as to a particular factual issue, then such issue is not genuine and may be disposed of summarily. However, if reasonable persons could disagree as to a factual issue’s resolution, then such issue is genuine, and trial on the merits is warranted. Sumner v. Sumner, 95-677 (La.App. 3 Cir. 11/8/95); 664 So.2d 718, writ denied, 95-2919 (La.2/9/96); 667 So.2d 531.
|7Mr. Buford’s Seaman Status under the Jones Act
As aforementioned, the test for seaman status is twofold and conjunctive. “First, ... ‘an employee’s duties must “eontri-but[e] to the function of the vessel or to the accomplishment of its mission.” ’ ... Second, ... a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration [the temporal element] and its nature [the functional element].” Chandris, 515 U.S. at 368, 115 S.Ct. at 2190 (citation omitted). See also Papai, 520 U.S. at 554, 117 S.Ct. at 1540; Roberts, 266 F.3d at 374. Each prong must be considered in turn.
The first prong of this fact-intensive test is a broad threshold inquiry. Typically, it is easily satisfied, and a maritime employee who does the ship’s work falls within the purview of the Jones Act. Indeed, “[a]ll who work at sea in the service of a ship” are potential seamen. Chandris, 515 U.S. at 368, 115 S.Ct. at 2190 (quoting McDermott Int’l, Inc. v. Wilander, 498 U.S. 337, 354, 111 S.Ct. 807, 817, 112 L.Ed.2d 866 (1991)). See also Wisner v. Prof'l Divers of New Orleans, 98-1755, p. 3 (La.3/2/99); 731 So.2d 200, 203, cert. denied, 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 238 (1999); Hufnagel v. Omega Serv. Indus., Inc., 182 F.3d 340, 347 (5th Cir.1999).
The court noted that Mr. Buford did not contribute to the vessel’s navigation. We note at the outset that it is neither necessary for the maritime worker to aid in navigation nor to participate in actual transportation of the vessel in order to satisfy the first prong. Little v. Amoco Prod. Co., 98-1130 (La.App. 1 Cir. 5/14/99); 734 So.2d 933, writ denied, 99-1752 (La.10/1/99); 748 So.2d 446; Wilander, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866; Wisner, 731 So.2d 200. Further, we find an absence of factual support for the trial judge’s blanket observation that Mr. Buford did not contribute to the accomplishment of a vessel’s mission. Mr. Buford’s Irresponsibilities with Cardinal included cleaning the work area and platform, lubri- *1275 eating, and painting. As a wireline helper, he maintained both the wireline and the down hole equipment and assisted „the wireline operator in servicing oil wells. We believe that some, if not all, of these tasks could be considered as contributing to the function of the particular vessel upon which they were performed or to the accomplishment of its mission. This is especially true in light of the Louisiana Supreme Court’s recent finding that a claimant who performed maintenance and repair work satisfied this first prong. Richard v. Mike Hooks, Inc., 2001-0145 (La.10/16/01); 799 So.2d 462.
To exhaust the inquiry of the first prong, we examine Mr. Buford’s work on each of the five vessels individually. The L/B J.A. Holleman, considered here in particular, had its own crew, of which Mr. Buford was not a member. Wireline operator Mr. Comeaux testified in deposition:
Q: So would you agree with me that there is also a purpose of the vessel to work off of or provide a place to operate the units and the other tools that were needed to conduct operations on the platform?
A: Yeah. We needed the boat to hold our [wireline] unit.
Mr. Tommy Masanz, Cardinal’s Eastern Division Wireline Manager, testified in deposition that the mission of the vessel was not to conduct wireline operations thereon. His belief mirrored the finding of the trial judge, namely, that its mission was to serve as a work area or work deck. However, if Mr. Buford was indeed using the vessel as a work area and was retrieving tools and such therefrom, then he could reasonably be considered as contributing to its mission.
More reasonably, however, a jury could conclude that, despite the testimony of Mr. Comeaux and Mr. Masanz, the vessel’s mission became wireline | aoperations in and of itself. This is particularly plausible especially since, according to the deposition testimony of Mr. Buford and others, the wireline unit was aboard the vessel and not the platform. Since Mr. Buford was a wireline helper, he reasonably could be considered to be doing this ship’s work even if, in addition to housing the wireline unit, the vessel served to house tools and to provide additional workspace as well. Accordingly, we believe that a genuine issue of material fact exists as to whether the wireline operations at the platform could have been accomplished in this instance had the vessel not been there.[1] If the operations could not have been so performed for whatever reason, then it is certainly reasonable that Mr. Buford’s duties as a wireline helper at this platform contributed to the function of the L/B J.A. Holleman or to the accomplishment of its mission. We focus particularly here on the L/B J.A. Holleman, as did the trial judge in his reasons for judgment. We note, however, that the totality of the employment-related circumstances need be considered — there are five vessels at issue here, not just one.
The M/V Cardinal III, the L/B T.C. Holleman, and the L/B J.W. Collins had only two people aboard, the wireline operator and Mr. Buford, the wireline helper. Even if he cannot rightfully be categorized as a member of a “crew,” each vessel was used to perform platform wireline operations, and Mr. Buford’s job was to assist in these operations. Therefore, along with his time as deckhand aboard the L/B R.E. Johnson assisting the short-handed crew, *1276 Mr. Buford could reasonably be considered to be doing these ships’ work and contributing to their respective missions.
|inThe second, “substantial connection” prong of the test is often the determinative one. It consists of both temporal and functional elements, which is to say that the focus is on the substantiality of the connection to a vessel or identifiable group of vessels. The connection must be substantial in terms of both duration and the nature.
First, “the inquiry into the nature [the functional element] must concentrate on whether the employee’s duties take him to sea.” Papal, 520 U.S. at 555, 117 S.Ct. at 1540. Mr. Buford’s duties were wireline work. This work necessarily took him to sea to various platform locations, notwithstanding the fact that he was flown by helicopter to the platform where he sustained the injuries that are the subject matter of this litigation. Wireline work does not always mandate the presence of a vessel. However, as discussed above, because the respective missions of the vessels could reasonably be construed as wire-line work, a genuine issue of material fact exists as to whether the nature of his work as a wireline helper substantiates his connection to Cardinal’s fleet. Cardinal points out in brief that the L/B JA. Holle-man was used primarily as a work area adjacent to the platform. It bears repeating, however, that the wireline unit was aboard the deck of the L/B J.A. Holleman. Also, it should not be ignored that Mr. Buford’s connection to the group of vessels in question is what matters. And the same logic that applies to Mr. Buford’s functional connection to the L/B J.A. Holleman applies to the other vessels as well.
As to duration (the temporal element),
A worker who spends less than about SO percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be | njustjfied in appropriate cases. ... And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict.
Chandris, 515 U.S. at 371, 115 S.Ct. at 2191; Roberts, 266 F.3d at 375 (emphasis added). Moreover, “[t]he 30 percent floor does not change when an ‘identifiable group’ of vessels in navigation is at issue, rather than just one vessel.” Roberts, 266 F.3d at 375. See also St. Romain v. Indus. Fabrication and Repair Serv., Inc., 203 F.3d 376 (5th Cir.), cert. denied, 531 U.S. 816, 121 S.Ct. 53, 148 L.Ed.2d 21 (2000); Hufnagel, 182 F.3d 340. “In deciding whether there is an identifiable group of vessels of relevance for a Jones Act seaman-status determination, the question is whether the vessels are subject to common ownership or control.” Roberts, 266 F.3d at 376 (quoting Papal, 520 U.S. at 557, 117 S.Ct. at 1541).
We begin first by recognizing that during his entire employment with Cardinal, all of Mr. Buford’s work was aboard Cardinal-owned and controlled vessels, i.e., those owned either by Cardinal, the Cardinal Marine Division, or another Cardinal division. There was no other vessel or any third party vessel involved. Depending on agreements with and requests from Cardinal’s oil company customers, wireline operations were often performed at a number of different job locations owned and operated by those customers. Cardinal submits that over 55 percent of Mr. Buford’s *1277 work was performed either in the Cardinal shop (22.25 percent) or while performing wireline work on a fixed platform where no vessel was involved (33.14 percent). Cardinal also submits, however, that Mr. Buford performed wireline services on wells from the M/V Cardinal III, the L/B T.C. Holleman, and the L/B J.W. Collins. According to the daily operations reports, the work upon these three vessels constituted 27.30 percent of Mr. Buford’s employment time. Moreover, the 11?jseven days in Cardinal’s marine division spent aboard the L/B R.E. Johnson assisting the shorthanded crew account for 10.21 percent. And finally, the assignment with the L/B J.A. Holleman accounts for 4.62 percent of his total working hours.
Mr. Buford suggests in brief, and we agree, that the trial judge neglected to consider the claimant’s time aboard all five vessels. He urges that, according to Cardinal’s own calculations, over 42 percent of his total working hours were performed on the five Cardinal-owned and controlled vessels. We believe this to be a reasonable assessment of the facts and one that creates a genuine issue thereof. Of all five ships, the L/B J.A. Holleman was the only one to have a separate crew. But, even if his time aboard this vessel is not calculated, his cumulative percentage of work time aboard Cardinal-owned and controlled vessels could reasonably remain above 30 percent. And it would not matter that the calculation was made without figuring in time associated with the L/B J.A. Holleman when Mr. Buford was injured. “[S]eaman-status is determined by the employee’s entire employment-related connection to a vessel, [or fleet of vessels] and not by the immediate circumstances or location of the plaintiffs injury.” Hufnagel, 182 F.3d at 346. See also Chandris, 515 U.S. at 363, 115 S.Ct. at 2187. Based on the totality of the circumstances of Mr. Buford’s employment, we do not find this to be a case where “undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, [where] the court may take the question from the jury by granting summary judgment or a directed verdict.” Id., 515 U.S. at 371, 115 S.Ct. at 2191.
When the facts are analyzed against the backdrop of the jurisprudence, we believe that a reasonable jury could conclude that Mr. Buford spent more than 30 percent of his employment time aboard Cardinal-owned and controlled vessels. [ 1sHowever, we note here that even if Mr. Buford did not attain the 30 percent requirement, we have doubt as to whether that would necessarily defeat his claim.
A jurisprudential exception to the 30 percent cutoff has developed. Even when the vessels in question are not under the defendant’s common ownership or control, a maritime worker may still fall within coverage of the Jones Act if he is “continuously subjected to the perils of the sea and engaged in classical seaman’s work.” Roberts, 266 F.3d at 378 (quoting Little, 734 So.2d at 938).
Nothing in the record suggests that Cardinal did not own and control the five vessels at issue in this case, and we do not find the common ownership and control of the vessels to be a central issue here. The facts of this case, therefore, do not squarely fit within this particular exception. However, we call attention and make reference to it simply to underscore what the United States Supreme Court originally said in Chandris, that “[a] worker who spends less than about SO percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline. ...” Chandris, 515 U.S. at 371,115 S.Ct. at 2191(emphasis added). See also Roberts, 266 F.3d at 375; *1278 Little, 734 So.2d at 936-937 (“It is important to keep this ‘thirty percent guide’ in proper context. We note that this guideline does not create a bright-line rule.”); Richard, 799 So.2d at 466 (“Thirty percent is not a magic number automatically rendering an individual’s connection with a vessel substantial in duration and nature. Thirty percent is simply a guideline, a minimum below which an individual generally does not qualify as a seaman”).
Classification of a maritime worker as a seaman is to be determined in consideration of this directive: “the Jones Act remedy is reserved for sea-based maritime employees whose work exposes them to ‘the special hazards and | udisadvantages to which they who go to sea in ships are subjected.’ ” Wisner, 731 So.2d at 205 (quoting Chandris, 515 U.S. at 370, 115 S.Ct. at 2190). If this is true, then coupled first with the fact that the 30 percent requirement was meant only as a general directive and second, that an exception has been carved out, we believe that a lesser than 30 percentage will not necessarily defeat a finding of seaman status if the work aboard the vessels exposes the seaman to maritime hazards.
Given the facts of this case, we conclude that a reasonable jury could find such hazardous exposure if it first found that Mr. Buford fell short of the 30 percent duration requirement of the second prong. Again, we make this point only as an aside, and reiterate again that we believe that a reasonable jury could find that Mr. Buford has met the 30 percent requirement and the two-part, conjunctive test for seaman status.
IV.

CONCLUSION

For the reasons assigned, the trial court judgment appealed from is reversed and set aside insofar as it grants summary judgment declaring no genuine issue of material fact as to Mr. Buford’s seaman status as contemplated by the Jones Act and the jurisprudence interpreting said Act.
REVERSED AND REMANDED FOR TRIAL ON THE MERITS.

. We recognize that in certain circumstances, a vessel is not necessary to complete wireline operations.