**Patrick C. RYAN, Plaintiff**

v.

**UNITED STATES of America, et al., Defendants**

**No. CIV. 02–2335.**

United States District Court, D. Maryland.

Aug. 17, 2004.

Robert M. Schwartzman, Lord and Whip PA, Baltimore, MD, for Plaintiff.

Robert H. Bouse, Jr., Jonathan Adrian Cusson, Anderson Coe and King LLP, Kimberly L. Limbrick, Crosswhite McKenna Limbrick and Sinclair LLP, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION

DAVIS, District Judge.

Plaintiff, Patrick C. Ryan, suffered a severe accidental injury in the course of his employment at the Patuxent River Naval Air Station in Maryland. He instituted this action for damages against the United States and the Department of the Navy ("the government" or "the government defendants"), and the following four government contractors and subcontractors: (1) Chesapeake Bay Diving, Inc. ("Chesapeake"), by which Ryan was formally employed; (2) Noesis, Inc., of which Chesapeake was a subcontractor, and which utilized Chesapeake employees, including Ryan, in the performance of its government contract at Patuxent; (3) General Dynamics Corporation ("General Dynamics"); and (4) American Systems Corporation ("ASC"). Ryan's remaining theories of recovery include negligence under the Jones Act, 46 U.S.C.App. § 688(a), and Maryland law.[1] Federal question and supplemental jurisdiction are the bases of this court's jurisdiction. 28 U.S.C. §§ 1331, 1367.

In an order entered on May 12, 2003, I granted the government defendants' motion to dismiss and thereby foreclosed all of Ryan's claims and defendants' related cross-claims against the government based on lack of subject matter jurisdiction. *See Ryan v. United States,* 304 F.Supp.2d 678, 2004 A.M.C. 749 (D.Md.2003). Thereafter, the remaining parties engaged in extensive discovery. Now pending are motions for summary judgment filed by Chesapeake, Noesis, and General Dynamics. (No party has opposed the motion for summary judgment filed by General Dynamics, and its motion shall be granted without further discussion.) For the reasons stated herein, I am persuaded that Chesapeake is entitled to judgment as a matter of law. On the other hand, Ryan and ASC have generated genuine disputes of material fact as to the potential liability of Noesis; accordingly, I conclude that Noesis is not entitled to judgment as a matter of law.

### I.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

---

**1.** Ryan has abandoned his ostensible third party actions under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b).

■ A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

## II. .

General Dynamics had a contract with the United States Marine Corps to design and build an Advanced Amphibious Assault Vehicle, referred to by the parties as an AAAV. In the spring and summer of 2000, General Dynamics was conducting a series of tests on, and evaluations of, the AAAV at the Patuxent River Naval Air Station in Maryland. Defendant Noesis was a party to government contracts incidental to General Dynamics' efforts in testing the AAAV, and Chesapeake was a subcontractor of Noesis. All three of these defendants have filed motions for summary judgment, both as to Ryan's claims against each of them, and also as to various cross-claims.

Neither Ryan nor defendant ASC has filed a motion for summary judgment, and with good reason. As between them, this case is a run-of-the mine negligence action arising under Maryland premises liability law. Specifically, under the relevant contract between ASC and the government, ASC was obligated to exercise general superintendency, including responsibility for the safety of those present in the workplace, over part of the premises where the AAAV testing work was performed at Patuxent. Assuming, *arguendo,* that Ryan can prove by a preponderance of the evidence that ASC breached one or more legal duties and that such breach or breaches of duty proximately caused Ryan's injuries, the principal interest of ASC is to shift responsibility for the accident, in whole or in part, to one or more of the other defendants, principally defendant Noesis. For his part, of course, Ryan wishes to present his claims to a jury against as many defendants as possible, on as many legal theories as possible.

At the time of the accident, July 15, 2000, Chesapeake formally employed Ryan as a commercial rescue diver. Pursuant to the agreement between Chesapeake and Noesis, Noesis utilized Chesapeake employees, including Ryan, in the performance of its contract with the government to provide, *inter alia,* "diver support services" attendant to the testing and evaluation undertaken by General Dynamics of the AAAV.[2] It appears that Ryan began performing duties at Patuxent pursuant to Noesis's contract with the Marine Corps in December 1999.

---

**2.** The written agreement between Chesapeake and Noesis had expired in 1998, but no party ascribes significance to that fact. Each continued its performance in disregard for the formal expiration of their written agreement.

The AAAV testing occurred in three phases: (1) "bollard testing;" (2) low speed testing; and (3) high speed testing. Ryan's duties, along with other divers utilized by Noesis, was to travel in a 50 foot fiberglass, government-provided, "dive boat" and/or to dive into the water (either from the shore or from the dive boat while away from the shore) in the performance of the following functions: (1) to verify that "the AAAV's tracks had properly receded or deployed;" (2) "to rig the cables to the pier pilings for the bollard test;" and (3) to follow behind the AAAV (while aboard the "dive boat") during the low and high speed tests in order to be available to rescue the crew of the AAAV if the need arose. In other words, Ryan spent some time aboard the dive boat, some time physically in the water (along the shore or out in the Patuxent River during the low speed and high speed testing runs), and some time on shore, in the performance of his duties as a rescue diver. Indisputably, however, as a result of weather conditions and other factors, there was "down time" during the testing of the AAAV; during such "down time," supervisors employed by ASC and Noesis would direct the rescue divers to perform other duties of a strictly land-based variety, some of which duties had little, if anything, to do, at least directly, with the AAAV project.

Viewed in the light most favorable to Ryan and ASC (which opposes Noesis's motion for summary judgment but not the motion filed by Chesapeake), the record shows that in the course of the work during the six months immediately preceding the July 15, 2000, accident, typical morning briefings, outlining the day's work, and the afternoon debriefing sessions, were attended by the following personnel: the AAAV testing director (apparently, a Marine Corps officer); a government civilian employee; a General Dynamics representative; an ASC supervisor ("Buddy" Guy); Noesis diver supervisors (Jim Vaughn and/or Harlan Chase); and Noesis's diving safety officer, Roger Eilertson. Vaughn, Chase, and Eilertson were professional divers, but their work on the project was primarily supervisory and administrative. Generally, the divers received daily work instructions from Vaughn. Eilertson was responsible for preparing the diving safety and rescue plans and made the determinations of when weather conditions permitted the safe running of the tests.

As mentioned above, although Ryan was deployed on the project as a diver, he performed other duties as well. On the day of his accident, he was not performing tasks as a diver. Rather, pursuant to directions from his on-site supervisors (who were employed by ASC and Noesis), he was helping to clean up the work area of the AAAV testing project in preparation for a visit by a high-ranking officer of the Marine Corps. The accident occurred when a wooden deck collapsed under the weight of a tow tractor when Ryan drove the tractor onto a pier being supported by the deck. When the wooden deck collapsed, the tractor fell into the water and Ryan's lower leg was partially amputated. There is evidence in the record that ASC's employees had performed specific repairs to the deck about six months before the accident.

Chesapeake's workers' compensation insurance carrier has paid Ryan substantial benefits under federal and state workers' compensation laws, *viz.*, the LHWCA and the Virginia Workers' Compensation Act, respectively. (Credits against the latter were derived from the payments made pursuant to the former.) Apparently, benefits paid under the LHWCA have been provided voluntarily by Chesapeake; benefits paid under the Virginia workers' compensation statute have been more formal and seemingly the result of adversarial

proceedings between Ryan and Chesapeake.

## III.

The issues framed by the motions for summary judgment filed by Chesapeake and Noesis center on the question of whether Ryan may successfully claim the status of a seaman under the Jones Act, 46 U.S.C.App. § 688(a), and if so, against which of the defendants, Chesapeake, Noesis, or both, might he proceed to trial under the Jones Act.

### A.

■ The Jones Act provides a cause of action against the employer of a seaman injured in the course of his employment. *See generally Wheatley v. Gladden,* 660 F.2d 1024, 1026 (4th Cir.1981). Specifically, to prevail on a Jones Act claim, a seaman must establish: (1) personal injury in the course of his employment; (2) negligence by his employer or an officer, agent, or employee of the employer; and (3) that the employer's negligence was a cause "in whole or in part" of his injury. *Hernandez v. Trawler Miss Vertie Mae, Inc.,* 187 F.3d 432, 436 (4th Cir.1999). Jones Act actions may be maintained only against a seaman's employer, and a plaintiff may maintain a Jones Act claim against only one employer. *See Mitola v. Johns Hopkins Univ. Applied Physics Lab.,* 839 F.Supp. 351, 354–55 (D.Md.1993) ("[A] 'seaman' is entitled to sue his employer, and only the single entity determined to be his employer, for negligence pursuant to the Jones Act.")( citing *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. 783, 791, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949)).

■ The Supreme Court has stated the following

> [T]he essential requirements for seaman status are twofold. First, ... an employee's duties must contribut[e] to the function of the vessel or to the accomplishment of its mission .... Second, ... a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature. The seaman inquiry is a mixed question of law and fact, and it often will be inappropriate to take the question from the jury. Nevertheless, summary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion.

*Harbor Tug and Barge Co. v. Papai,* 520 U.S. 548, 554, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997) (citations and internal quotations omitted; alterations in original). I am satisfied that Ryan has either established the elements necessary to accord him seaman status as a matter of law or, in the alternative, has generated genuine disputes of material fact as to his status as a seaman.

### 1.

■ The first question is whether Ryan's duties contributed to the accomplishment of the mission of a vessel. *Id.* Ryan contends that his duties contributed to the accomplishment of the mission of the government-owned dive boat utilized in the AAAV testing program. I conclude that this issue is easily resolved as a matter of law.

The dive boat was a 50–foot, gray, fiberglass motorized vessel with neither distinguishing numbers nor a hailing port. It was used as a platform for the divers to observe and, if necessary, conduct rescue operations for the individuals piloting and testing the AAAV. The dive boat's mission was to serve as a floating base of operations where the divers would be in a position to provide rescue support services during the testing of the AAAV.

Ryan was a commercial diver performing the customary duties of one assigned to the tasks assigned to him. Ryan's duties were to "alternate with other divers to dive under water to: (1) verify that the tracks of the AAAV had properly receded or deployed; (2) rig the cables to the pier pilings for the bollard test; and (3) follow the AAAV during its low speed and high speed tests to be available to rescue the AAAV crew." Also, Ryan "assisted the other divers while topside." Plainly, Ryan's duties contributed to the dive boat's mission, and Ryan has satisfied the first requirement of Jones Act seaman status.

### 2.

The second prong of the test for seaman status asks whether Ryan had "a connection to a vessel in navigation ... that is substantial in terms of both its duration and its nature." The Supreme Court has not elucidated in great detail the second Jones Act requirement because, it has stated, "[i]n defining the prerequisites for Jones Act coverage, we think it preferable to focus upon the essence of what it means to be a seaman and to eschew the temptation to create detailed tests to effectuate the congressional purpose." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). The Court views the substantial connection requirement as follows:

> The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the seabased maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a

vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea. *Id.*

In this case, it is undisputed that Ryan's connection to the dive boat was "substantial in terms of ... its nature." *Papai*, 520 U.S. at 554, 117 S.Ct. 1535. The question presented is whether Ryan's connection with the dive boat was "substantial in terms of ... its duration." *Id.* "[W]here undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict." *Id.* Viewed, as they must be, in the light most favorable to Ryan, the non-movant, the facts here are genuinely disputed.[3]

█ The Supreme Court has cited approvingly the Fifth Circuit's use of a "30% guideline" in the assessment of the amount of time a crew member must spend in connection with a vessel in navigation: "Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act .... This figure of course serves as no more than a guideline ... and departure from it will certainly be justified in appropriate cases." *Chandris*, 515 U.S. at 371, 115 S.Ct. 2172.

█ Chesapeake contends that Ryan spent less than 30% (namely, only 14%) of his time "on the water" and that, in any event, he spent significantly less than 30%

---

**3.** Noesis seems to make a passing suggestion that the dive boat was not "in navigation," or perhaps, was not "in navigation" "enough of the time" to satisfy the test of seaman status, but none of the parties have briefed this issue.

I presume that it is an issue that will be submitted to the jury at trial, but it may be that, upon further submissions from the parties at the pre-trial stage (or at trial), I will take this issue away from the jury.

of his work hours performing "diving" chores. Ryan, on the other hand, contends that his time "in the service of a vessel in navigation" exceeded the 30% guideline, and specifically maintains that he "spent about half of [his] time working from the dive boat; [and m]ost of the remainder of [his] work was spent working on and maintaining dive equipment." Chesapeake appears to evaluate the duration prong of the test based solely on the activities that Ryan performed "on the water." I agree with Ryan, however, that this approach is too narrow. Ryan's diving duties necessitated that he not only spend time onboard the dive boat to be in a position to provide rescue services, but his duties also required that he perform creditable service on shore, *e.g.*, outfitting the boat and caring and maintaining the diving equipment. It is appropriate to take into consideration not only the work that Ryan actually performed on the dive boat, but, as well, the work he performed on shore in relation to the diving mission. *See Barrett v. Chevron USA, Inc.*, 781 F.2d 1067, 1075 (5th Cir.1986)("[I]f the employee's regularly assigned duties require him to divide his time between vessel and land (or platform) his status as a crew

member is determined 'in the context of his entire employment' with his current employer.")( *citing Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1347 (5th Cir. 1980)).The mere fact that Ryan performed non-creditable duties during "down time" (such as the "clean-up" duties he was performing at the time of his accident) does not compel the conclusion that he has failed as a matter of law to support the duration prong of the test of Jones Act seaman status. Hence, there exists a genuine issue of material fact as to what duties should count (and thus, the time needed to perform them) towards the 30% guideline relevant to the determination of the duration prong of the test for Jones Act seaman status.[4]

### B.

For the reasons stated above, defendants Chesapeake and Noesis have not established as a matter of law that Ryan fails to marshal sufficient evidence to establish his status as a seaman under the Jones Act. The next question is which of those defendants, if either, is properly deemed a Jones Act employer. For the reasons set forth below, I am persuaded that Chesapeake is entitled to judgment on

---

**4.** In my earlier memorandum opinion, I stated the following:

> I note that, by his own account, Ryan's duties on the day of his accident were solely confined to using a tow tractor to assist in cleaning the pier and he was not acting in the capacity of "seaman" when he was injured. *McDermott Int'l, Inc.*, 498 U.S. at 355, 111 S.Ct. 807. As is required by the Jones Act to prove "seaman status," Ryan cannot establish that his duties "contribute[d] to the function of the vessel or to the accomplishment of its mission." *Id.* at 355, 356–57, 111 S.Ct. 807 (internal quotations omitted) (determining that "a paint foreman injured on an oil drilling platform in the Persian Gulf while assigned to a '*paint boat* ' carrying his painting equipment qualified as a Jones Act seaman) (emphasis added)." In short, Ryan was not "doing the

ship's work" at the time of his injury. *Id.* at 355, 111 S.Ct. 807.

304 F.Supp.2d at 684 n.2. These observations (made before there had been any discovery in this case) were made in response to Ryan's futile attempt to support his assertion that he had achieved seaman status in respect to *the government defendants*, and are not remotely controlling here. As I pointed out in the text accompanying the above footnote, plainly, Ryan was not an employee of the government at the time of his accident, or at any time. Thus, his failure to attain seaman status in respect to the government (and consequently, his failure to establish subject matter jurisdiction as to his claims against the government) was manifest. The private employer defendants here can draw no solace from the above *dictum* in my earlier memorandum opinion.

this issue as a matter of law. On the other hand, I am constrained to conclude that Ryan has generated a genuine dispute of material fact as to whether, as a "borrowed servant," he may pursue his Jones Act claim against Noesis; accordingly, Noesis's motion for summary judgment shall be denied.

### 1.

As mentioned above, only a single employer has potential liability under the Jones Act. *Mitola*, 839 F.Supp. at 354–55. In the case at bar, for Jones Act purposes, Ryan has not contended that he is an employee of two or more entities, *e.g.*, Chesapeake and Noesis, which together comprise his *joint employer*. *Cf. Guidry v. South Louisiana Contractors, Inc.*, 614 F.2d 447, 452 (5th Cir.1980)("While there might be instances of joint control of one person by two employers giving rise to both becoming vicariously liable for his actions, *see Restatement (Second) of Agency* § 226, Comment a (1958), the facts present no such possibility here."). Rather, Ryan's approach has been to bring suit against all of his *potential* employers (and General Dynamics) and to seek such relief from such entities as the facts and the law might permit. Furthermore, neither Chesapeake nor Noesis has "pointed a finger" at the other by opposing their respective motions for summary judgment. Thus, *except as discussed below*, the case has been litigated *largely* on the assumption that, if Ryan may sue as a seaman for Jones Act negligence, either Chesapeake or Noesis (but not each) is a Jones Act employer under the circumstances of this case.

### 2.

Chesapeake makes two arguments in support of its contention that, as a matter of law, it is not liable as a Jones Act employer. The first argument is that because it neither owned nor controlled the dive boat, *i.e.*, the "vessel in navigation" in respect of which Ryan may be found by the jury to enjoy Jones Act seaman status, Chesapeake is not Ryan's employer as to the accident in suit. The second argument is that because its insurer paid benefits to Ryan under federal and state workers' compensation laws, Chesapeake has immunity from suit under the Jones Act, even assuming it is otherwise a Jones Act employer.

██ The latter contention plainly lacks merit. *See Southwest Marine, Inc. v. Gizoni*, 502 U.S. 81, 84, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991) (holding that a maritime worker whose occupation is one of those enumerated in the Longshore and Harbor Workers' Compensation Act may also be a seaman within the meaning of the Jones Act, and is thus entitled to bring suit under the Jones Act, notwithstanding the receipt of voluntary payments under LHWCA as workers' compensation benefits by his employer, and noting that the LHWCA specifically provides that any amounts paid to an employee for the same injury, disability, or death pursuant to the Jones Act shall be credited against any liability imposed by the LHWCA); *Commercial Union Insurance Co. v. McKinnon*, 10 F.3d 1352, 1354 (8th Cir.1993) (permitting employer's insurer, who had paid state workers' compensation benefits to injured worker, to recover in a separate suit, amounts paid to injured worker in settlement of subsequent Jones Act claim, and applying state law provision specifically providing that state workers' compensation benefits were not available for work-related injuries "exclusively covered by any federal law;" further holding that "any recovery received under the Jones Act should be reduced by any payments previously received under a state's workers' compensation law," citing, *inter alia, Biggs v. Norfolk Dredging Co.*, 360 F.2d 360, 364 (4th Cir.1966)). In short, Chesapeake would be entitled, at most, to a reduction

in any damage award to Ryan were he to succeed on a Jones Act claim against Chesapeake.

As to the contention that its lack of ownership and control over the dive boat carries legal significance, Chesapeake makes a more plausible argument. It relies on several recent Supreme Court cases which emphasize the centrality of the employer-employee relationship in respect to the particular Jones Act vessel on which liability was predicated as a critical precondition to Jones Act liability. In particular, Chesapeake quotes Justice Stevens's dissenting opinion in *Papai*, 520 U.S. at 563, 117 S.Ct. 1535: "[I]n order to hold a particular employer liable, an employment relationship must have existed between the worker and the particular vessel owner at the time of the injury."

The Supreme Court held in *Papai* that for a plaintiff to claim Jones Act protection in respect to a fleet of vessels, there must be common ownership or control of the fleet (the "fleet doctrine"). *Papai*, 520 U.S. at 559, 117 S.Ct. 1535. ("An important part of the test for determining who is a seaman is whether the injured worker seeking coverage has a substantial connection to a vessel or a fleet of vessels, and the latter concept requires a requisite degree of common ownership or control."). In so holding, the Court made clear that a worker injured on a particular vessel cannot aggregate the time spent on other vessels comprising a "fleet" of vessels to meet the duration element of the test for seaman status unless a sole employer owns or controls the "fleet." Chesapeake argues, analogously (and largely impliedly), that, at least under circumstances in which one putative Jones Act employer (such as Chesapeake) has absolutely no ownership interest in, and exercises absolutely no control over, the particular vessel in respect of which a plaintiff claims seaman status, but another putative Jones Act employer (such as Noesis) exercises substantial control over the relevant vessel as well as substantial control over the duties and work conduct of the plaintiff, the court should hold as a matter of law that Jones Act liability against the former is foreclosed.

Ryan contends that the "ownership and control" factors relied on by Chesapeake are not sufficient to exonerate Chesapeake from Jones Act liability under the facts of this case and that he should be permitted to proceed against Chesapeake as well as Noesis. In support of his contentions, Ryan relies primarily on a line of Fifth Circuit cases that are the progeny of *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir.1975), *overruled in part on other grounds, Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir.1997) (en banc).

In *Spinks*, the Fifth Circuit reviewed a judgment in favor of defendants against a 19–year–old plaintiff claiming seaman status. Spinks was an employee of Labor Services, Incorporated. Labor Services's business, among other things, was the provision of laborers to work on "oil rigs and drilling barges." Labor Services contracted with Chevron to provide laborers for one of Chevron's drilling barges. *Spinks*, 507 F.2d at 226. Spinks sued Labor Services and Chevron in separate cases under the Jones Act and the LHWCA, respectively. The district court ruled that because Spinks was a borrowed servant of Chevron, Labor Services was no longer Spinks's Jones Act employer. *Id.* The Fifth Circuit reversed the judgment in favor of Labor Services on that ground, observing, "[t]hat a seaman [who] is a borrowed servant of one employer does not mean that he thereby ceases to be his immediate employer's servant." *Id.* at 224. The court further reasoned that:

If an injured seaman must speculate at his peril on whether the trial court ulti-

mately will find him a borrowed employee of the shipowner, or an employee of his immediate employer, we reject the theory. Such a rule can result in defeating Jones Act rights through contractual manipulations. We see nothing offensive in suing an immediate employer under the [Jones] Act, or even both employers in the alternative. The defendants can sort out which between them will bear the final cost or recovery, either through common law indemnity or contribution principles, or contractual provisions . . . .

*Id.* at 226; *see also Barrios v. Louisiana Construction Materials Co.,* 465 F.2d 1157, 1164–65 (5th Cir.1972) (holding that the employer need not be the owner or operator of the vessel).

■ The Ninth Circuit has noted that the Fifth Circuit's discussion in *Spinks* constitutes *dicta* (because, in fact, the plaintiff had sued only one putative employer—Labor Services but not Chevron, under the Jones Act, and not two entities) and, in any event, is an improper rejection of the "one-employer" rule of *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949). *See Glynn v. Roy Al Boat Management Corp.,* 57 F.3d 1495, 1500 (9th Cir.1995). The Ninth Circuit reasoned as follows, in part, in declining to follow *Spinks:*

[T]he Supreme Court indicated in *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949), that there can be only one Jones Act employer, and neither Glynn nor Roy Al has ever argued that Shawhan was Glynn's sole employer.

The Court states in *Cosmopolitan* that "[w]e have no doubt that under the Jones Act only one person, firm, or corporation can be sued as employer." *Id.* at 791, 69 S.Ct. at 1322. In the face of the plaintiff's argument that he could sue a general agent of the United States

as his Jones Act employer, the Court indicated that "[e]ither Cosmopolitan or the Government is that employer." *Id.* Of the relatively few courts since *Cosmopolitan* to consider the issue, most have interpreted this language to mean that a plaintiff can hold only one employer liable under the Jones Act. *See, e.g., Savard v. Marine Contracting Inc.,* 471 F.2d 536, 541 (2d Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2778, 37 L.Ed.2d 404 (1973); *Hickman v. Ohio Barge Line, Inc.,* 376 F.Supp. 1092, 1094 (W.D.Pa.1974); *Trexler v. Tug Raven,* 290 F.Supp. 429, 451 (E.D.Va.1968), *rev'd on other grounds,* 419 F.2d 536 (4th Cir.1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 271 (1970).

Neither *Spinks* nor *Guidry* is to the contrary. *Spinks* involved a "borrowed servant" arrangement under which the injured seaman's immediate employer (Labor Services) provided his labor aboard a barge owned by another company (Chevron). In that context, the court suggested that "[i]t would seem reasonable . . . that a seaman may have more than one Jones Act employer," 507 F.2d at 225, but concluded that it "need not . . . pass on the question whether Spinks could sue Chevron and Labor Services under the Jones Act" because "Spinks sued only one employer—Labor Services," *id.* at 226. *Guidry* cites *Spinks* for the proposition that "[i]t . . . may be possible for a seaman to have more than one Jones Act employer" in a similar situation. 614 F.2d at 452. In *Guidry,* however, the court concluded that under the facts of the case, there was no basis for finding that at the time of his injury, the plaintiff was employed as a "seaman" by one of the defendants. *Id.* at 453–54. Thus, the statements in both cases about the possibility of more than one Jones Act employer are dicta, and in any event are not persuasive in the [present] case.

*Id.* This reasoning is compelling. The mere fact that Chesapeake formally issued a paycheck to Ryan is not determinative of its status as a Jones Act employer in every case in which one of its "loaned employees" suffers a workplace injury.

■ On the contrary, I am persuaded that *Spinks* and its progeny are wholly inconsistent with emanations from more recent Supreme Court pronouncements, *e.g., Papai,* which, together with *McAllister,* 337 U.S. at 791, 69 S.Ct. 1317, point with convincing persuasiveness to the conclusion (even if they do not *hold*) that "there can be no more than one 'employer' for purposes of the Jones Act," *Roy Al Boat Management Corp.,* 57 F.3d at 1497, at least under circumstances in which, as here, two putative Jones Act employers "do not contend that one, rather than the other, is the employer." *Id.* In sum, I am satisfied that, as a matter of law in respect to Ryan's ostensible status as a seaman under the Jones Act, the indicia of plenary control exercised (or available to be exercised) by Noesis over the work site, over Ryan's day-to-day activities in respect to the dive boat, and in particular, Noesis's total if joint control (with ASC) over Ryan's "down time" activities, activities in which Ryan was in fact engaged at the time of the accident, militate heavily against the reasonableness of any finding by a jury consistent with Ryan's contention that Chesapeake was his Jones Act employer on the Patuxent River project. When this undisputed evidence is then coupled with the undisputed evidence of an utter lack of any measurable control over such matters by Chesapeake at any time material to the accident, the conclusion is compelled as a matter of law that if Ryan enjoyed seaman status as to "only one employer," such status existed as to Noesis and not as to Chesapeake. Accordingly, Chesapeake is entitled to judgment as a matter of law.

### 3.

■ What has already been stated largely disposes of Noesis's contentions that it did not have an employer-employee relationship with Ryan on the day of the accident.

In determining whether a person was a borrowed servant, the Fourth Circuit has reasoned as follows:

> A person can be in the general employ of one company while at the same time being in the particular employ of another "with all the legal consequences of the new relation . . . ." In order to determine whether an employee is a borrowed servant, courts "must inquire whose is the work being performed . . . by ascertaining who has the power to control and direct the servants in the performance of their work."

*White v. Bethlehem Steel Corp.,* 222 F.3d 146, 149 (4th Cir.2000) (citations omitted). Ryan testified that, when he started on the AAAV project, he was told that he and the other Chesapeake divers were to report to Noesis. Moreover, the record supports the view that "Chip" Chase, a Noesis employee, was the program manager for diving, *i.e.,* the designated "diving superintendent." There is also substantial evidence to the effect that when Chase was not present on the job, Jim Vaughan, another Noesis employee and "diving supervisor," was responsible for oversight of all the diving operations. Noesis's contentions that an ASC employee, "Buddy" Guy, was responsible for supervising Ryan on the day of his injury because Guy instructed Ryan as to what to do, is beside the point, as Ryan freely admitted that he received orders from all three men, including orders received second- and third-hand. The fact that Ryan was performing cleanup duties rather than duties directly related to the AAAV testing is not determina-

tive. I agree with Ryan and ASC that a reasonable juror could reasonably conclude, for the same reasons that Chesapeake was *not* a Jones Act employer as to Ryan, that Ryan was Noesis's "borrowed servant" and that therefore, if the elements of a Jones Act claim are otherwise established, that Noesis is liable to Ryan for the injuries he suffered in the accident.

Finally, for the reasons stated above, Noesis's further contention, that Ryan's election to accept payments from Chesapeake's insurer under federal and state workers' compensation statutes immunizes Noesis against Ryan's Jones Act claim lacks merit.

### IV.

For the above reasons, Chesapeake and General Dynamics are entitled to summary judgment, and Noesis is not entitled to summary judgment. Ryan may present his Jones Act negligence claim to the jury on the theory that at the time he suffered his on-the-job accidental injuries, he was a seaman within the contemplation of the Jones Act, and furthermore, that he was a "borrowed servant" of Noesis.